No. 2--07--0393    Filed: 12-23-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--1643 |
| MANUEL J. RINCON, | ) ) | Honorable Leonard J. Wojtecki, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

Following a bench trial, defendant, Manuel J. Rincon, was convicted of attempted arson (720 ILCS 5/20--1(a), 8--4(a) (West 2004)). Defendant appeals, arguing that his right to a jury trial was violated, that the State failed to prove his guilt beyond a reasonable doubt, and that the State committed a prejudicial discovery error. For the following reasons, we affirm.

FACTS

Defendant was indicted for attempted arson (720 ILCS 5/20--1(a), 8--4(a) (West 2004)) and criminal trespass to land (720 ILCS 5/21--3(a)(2) (West 2004)). The indictment stemmed from an incident in the early morning hours of July 13, 2005. Prior to trial, the State dismissed the criminal trespass to land charge.

At the arraignment on January 19, 2006, defendant was present with his attorney when the court informed him of his rights, including the following:

"You have constitutional rights. You have the right to be represented by a lawyer. It appears that you are ably represented by Attorney Corbett.

You have the right to remain silent.

You have the right to plead not guilty.

You are presumed innocent.

You have the right to a trial by judge or jury."

Defendant pleaded not guilty and reserved his right to a trial by jury. The common-law record contains jury trial orders dated April 21 and July 21, 2006, setting the case for jury trial on October 27, 2006.

On October 27, 2006, defendant was present in open court at a final pretrial conference. After granting the State's motion to deny defendant inquiry into the criminal histories of its witnesses, the court asked defense counsel if he had any motions in limine. Defense counsel replied: "Judge, nothing in writing. We are indicating a bench trial on this matter, so we are answering ready to go." Additionally, the following colloquy took place:

"THE COURT: I don't believe we've addressed Mr. Rincon as to a jury waiver. You're advising the court he wants to waive jury?

MR. CORBETT [defense counsel]: Yes, sir.[1]

THE COURT: Do you want to reserve until Monday?

MR. CORBETT: Can we reserve it until Monday?

---

[1]We note that defendant's brief, though it describes Mr. Corbett's indication of a bench trial and the court's reservation of the matter of whether there would be a jury trial, omits mention of the emphasized portion of the colloquy.

THE COURT: We'll reserve until Monday. So I'll show that both sides are ready."

(Emphasis added.)

Following that exchange, the court and defense counsel discussed possible arrival times for witnesses, depending upon whether the trial was a bench or a jury trial.

On October 30, 2006, with defendant present, the court asked defense counsel if the trial would be a bench trial, and counsel responded affirmatively. As on October 27, 2006, defendant voiced no objection. After a conference pursuant to Supreme Court Rule 402 (177 Ill. 2d R. 402), which was off the record, defendant elected to go to trial. The court then returned to the State its tendered jury instructions and heard opening arguments. A written jury waiver signed by defendant was filed October 30, 2006, as well.

Maria Loyola was the State's first witness. She testified that she lived in a townhome at 2009 Berkshire Circle, apartment J, in Carpentersville, Illinois, with her husband, four children, and son-in-law. Through her nephew, Loyola had known defendant by his nickname, Payaso, for a few years prior to July 2005. In the days leading up to the incident of July 13, 2005, Loyola's two nephews, her son, and others gathered in her front yard, wearing blue shirts and khaki-colored pants. These were the colors of the Sureno Thirteens street gang, to which the nephews and several of the others belonged. Loyola's son was not a gang member, but his school uniform was blue and khaki. From Loyola's yard, the group regularly "flashed signs" to other boys. Latin Kings gang members also commonly "threw" Kings' signs toward Loyola's house. On the evening of July 12, 2005, Loyola's daughter told her that defendant had gone by their home "making signs." This worried Loyola, who consequently spent the night in her living room.

The living room had a sliding door that opened onto a small patio at the front of the house. At the time, the glass in the door was broken, leaving only a screen. At about 1:40 on the morning of July 13, 2005, the motion sensor light over the driveway was activated, illuminating the yard in front of the patio. Loyola observed in her yard three persons approaching the two trucks parked in her driveway. She recognized defendant when she saw his surprised expression in the light of the motion sensor, and she was able to identify a second man, whom she knew as "Psycho." She was unable to identify the third person, who was wearing a black hoodie. The men were about 10 or 15 feet from the trucks in the driveway. Loyola testified that defendant tried twice with a lighter to light something white sticking out from the top of a bottle being held by Psycho. There was something in the bottle, but Loyola could not identify it and did not smell gasoline. When Loyola saw sparks, she yelled and went outside the screen door onto the patio. The three ran off in the direction from which they had come, to a car parked about three townhouses down the street. Four people were in the car when it drove away.

Loyola never found the bottle or the lighter. No one in her home awakened. There was no damage to her property. Rather than calling the police immediately, because she felt that they would not take her seriously, Loyola waited until that afternoon to go to the police station and report the incident. Subsequently, Loyola identified defendant and a codefendant, Fernando Rodriguez (a.k.a. Psycho), from photo lineups.

Loyola's 18-year-old daughter, Uesenia Ramirez, testified that she lived at the Berkshire Circle townhome with her parents, siblings, and husband. In the days leading up to July 12, 2005, members of the Sureno gang had "hung out" in the yard, dressed in blue and khaki. It was common to have gang signs flashed back and forth. On the evening of July 12, 2005, Ramirez was in the front

yard, sitting on the small patio with her younger sister. Her brother and other sister were going in and out of the sliding patio door. No Sureno members were present then. According to Ramirez, at about 8 p.m., a gray, four-door Pontiac drove by with two girls in the front seat and defendant and Rodriguez in the back seat, with defendant nearest the townhouse. Ramirez said that she knew defendant because he used to "hang around with his friends" in that area. As the car drove by, it slowed and defendant was "throwing signs and saying things." From the car, defendant said, "King Love, Sureno Killa [Killer]." Ramirez was afraid, so the family called the police, but they did not respond. Ramirez was asleep during the 1:40 a.m. incident and did not hear anything, but she went with her mother that afternoon to the police station.

Manuel Medel, Ramirez's brother-in-law, testified that he owned a 2004 Dodge Ram pickup truck. He had financed it for approximately $30,000. Medel had parked it in Loyola's driveway for the night of July 12-13, 2005. He had given no one permission to damage it or to be near it.

Detective Thomas Heitkamp of the Carpentersville police department testified that he investigated the attempted arson at Berkshire Circle. After being assigned to the case on July 19, 2005, he compiled photo lineups and showed them to Loyola the same day. This was Heitkamp's first contact with Loyola. Heitkamp was accompanied by Officer George Gonzalez, who served as a translator. Gonzalez translated the standard photo spread advisory form, which stated that the suspect may or may not be in the lineup, that Loyola did not have to make an identification, and that Loyola was not to assume that the officers knew whether the suspect was in the lineup. Loyola signed the form and then immediately identified defendant in the first lineup. She then identified Rodriguez from the second lineup. Heitkamp had Loyola sign her name and write a brief description of what she had seen each suspect do on July 13. Each of the identified photos was one of six photos

in its lineup and was located in the top left position. Prior to July 19, Heitkamp had been familiar with defendant and knew his nickname, Payaso, which was included in the police report.

Following Loyola's identifications, Heitkamp had a warrant issued for defendant's arrest. He did not speak with defendant or defendant's family prior to having the warrant issued. No physical evidence or other eyewitnesses were found; consequently, there was no evidence of what was in the bottle. No one took a statement from Rodriguez. The police report, made on July 13, 2005, at 12:50 p.m., listed the incident as criminal damage to property (not attempted arson) occurring at 1:40 a.m. that day. Heitkamp was not aware of any calls made to the police department from the Loyola residence.

Gonzalez testified that he had been part of the gang and drug unit, also known as the community response team, for four years. After describing his experience and training, and over defense objection, Gonzalez was qualified by the court as an expert on gangs. Gonzalez was knowledgeable about two street gangs in Carpentersville--the Latin Kings and the Surenos. The Kings and the Surenos were rival gangs in July 2005. Each gang had areas of the city that it considered its own. The Kings considered the area of Berkshire Circle to be theirs. To intimidate, they used the slogans "King Love" and "King Hood" and the sign of a crown. According to Gonzalez, rivalry between the gangs resulted in physical confrontations, including driving by rival gang members' homes, yelling gang slogans, throwing up gang signs, damaging property, and committing arson. A common method of arson was the "Molotov cocktail," a bottle containing a flammable liquid with a rag placed in it, which would be lit and either placed on or thrown at the target.

After testifying about the gangs in general, Gonzalez testified that defendant's nickname was Payaso and that he was a member of the Latin Kings in July 2005. Rodriguez was a Latin King too. Loyola's son, Raymond Perez, was not known to be a gang member, but he associated with the Surenos and allowed them to congregate in his yard. Perez wore the Sureno colors, blue and khaki, as part of his school uniform. Loyola's two nephews were Sureno members. When questioned about five other men, Gonzalez said that two of them were known Surenos. Gonzalez's only role in the investigation was to accompany Heitkamp, as a translator, to Loyola's home for the photo lineups.

After Gonzalez's testimony, the State rested and the court denied defendant's motion for a directed finding. The defense began its case by calling Blanca Rincon, defendant's sister. In July 2005, she lived in a four-bedroom house in Carpentersville with defendant, their parents, her three sons, and her boyfriend. The house had ceramic flooring. The family had a Chihuahua dog that barked loudly when cars or strangers passed by. Blanca's bedroom was at the front of the house. It had very light curtains such that she could see if the motion sensor light on the front of the house were on. Next to Blanca's bedroom were her sons' bedroom, then defendant's bedroom, and her parents' bedroom, all in a row. The front screen door was noisy, and the main door was "too heavy" and equipped with a special lock that made it "kind of noisy" too.

Blanca testified that July 12, 2005, was "just a normal day like every day." Nothing special happened. She arrived home from work at about 4 p.m. Blanca could not recall what they ate, but, as was typical, the entire family, including defendant, ate dinner together at about 5 p.m. Defendant may have gone out, but was home by 9 p.m. when their mother went to bed. At that time, Blanca was in her bedroom, reading to her. After that, Blanca saw defendant watching videos with her boyfriend. The dog was there too. Blanca went to bed at about 10:30 p.m. and was joined by her

boyfriend around 11 p.m. Defendant went to his room at that time. Between then and 5:30 a.m., Blanca heard nothing and did not see the motion sensor light come on. When she left for work at 6:30 a.m., Blanca knocked on defendant's bedroom door to tell him she was leaving, since he babysat for her sons; defendant responded to her knock. Although she had not gotten up at 1:30 a.m. to check, Blanca was sure that defendant had been home then. If he had left the house, she would have heard him because he was heavy, noisy, and clumsy. She was also sure that, had he left, she would have heard the dog barking and the front door slamming, because her window was open and located only two feet from the front door. Blanca was aware that defendant was a Latin King and a friend of Rodriguez in July 2005. Having previously lived on Berkshire Circle, Blanca had noticed that Latin Kings frequented that area. Blanca had not gone to the police or State's Attorney to report that defendant was innocent, despite her certainty that defendant had been home all that night. No one from the police department attempted to interview her about the incident.

Maria DeJesus Rincon, defendant's mother, testified similarly to Blanca. Maria was a light sleeper and had gone to bed at about 8:30 p.m. on July 12, 2005. Nothing special happened on that date to make it memorable. Defendant's bedroom door was noisy like the front door. Although she did not go to check on defendant at 1:30 a.m. on July 13, Maria was sure that defendant was home all night, because she had not heard him leave. If he had gone out, she would have heard his heavy footsteps on the ceramic-tiled floor, as she had in the past. She also did not hear the dog bark, and the dog always barked if someone came up the driveway. No one from the State's Attorney's office or the police department had spoken with Maria. Defendant turned himself in to police on July 25, 2005. Maria did not go to the authorities to voice her belief that defendant was innocent, because "they were the ones who should have come to see." Maria was aware that defendant was a Latin

King in July 2005. Although she used to live on Berkshire Circle and was aware of "boys that would hang out there," she never talked to them.

Defendant testified and admitted that he was "associated with" the Latin Kings and that he had been convicted of a felony charge of harassment of a witness. He was familiar with Latin King gang signs and had "thrown up the crown" in the past. Defendant was also familiar with the Latin King manifesto (constitution), bylaws, and colors. The Kings and Surenos were rivals and did not get along. During July 2005, the "Latin King gang neighborhood" included the Berkshire Circle area. Defendant had seen people wearing Sureno colors gathered in front of Loyola's townhome, while Latin Kings were congregating just down the street. He and Loyola had known each other for 1½ or 2 years. Defendant knew Loyola's nephews and had seen one of them in Loyola's yard with other Surenos, wearing Sureno colors, but he did not know Perez. Prior to July 12, 2005, defendant had driven by Loyola's townhome and "showed them [the Surenos] the crown." The Surenos responded by "throwing down the crown," which was a sign of disrespect to the Kings. Under the gang's constitution, a King was expected to respond to such confrontation. The response could take the form of throwing more signs or damaging property, including property where Sureno gang members were known to assemble.

Defendant confirmed Blanca's and Maria's testimony regarding the ceramic flooring, the dog, and the motion sensor light. On July 12, 2005, he had dinner with his family and then went out with his friends as he usually did, returning at about 8 p.m. He had not thrown gang signs that evening, or even driven by Loyola's home. Defendant had no contact with Rodriguez that night. He did not leave the house after 9 p.m. on July 12; he watched MTV videos with his brother-in-law, as he usually did. Defendant was home sleeping at 1:30 a.m. on July 13, 2005. He had never heard of a

Molotov cocktail. Defendant did not attempt to start a fire that night in Berkshire Circle and had never done so in the past. Defendant said that the police had not interviewed him about the incident but that, when he discovered a few days later from a friend that there was a warrant for his arrest, he turned himself in.

After defendant's testimony, the defense rested and the State offered no rebuttal. Following closing arguments, on November 3, 2006, the court found defendant guilty of attempted arson. The court concluded that defendant had a motive; that essentially he was trying to light a Molotov cocktail; that there were sparks; and that defendant was positively identified as the person with the lighter. The court believed Loyola's testimony but did not believe defendant or his witnesses, as they were "somewhat incredible."

On December 4, 2006, defendant filed a motion for acquittal or for a new trial, alleging insufficiency of the evidence. The court denied defendant's motion at a posttrial hearing on December 22, 2006. Defendant appealed from this denial on January 22, 2007. However, on January 26, 2007, upon defendant's motion, the trial court struck the appeal as premature. An agreed sentence of two years' imprisonment was subsequently imposed on February 16, 2007, with credit for time served and with one year of mandatory supervised release. Defendant filed a notice of appeal on the same date.

However, on March 9, 2007, defendant filed an emergency motion for acquittal or for a new trial, based on a supplemental answer to discovery tendered to defense counsel on the same date. It advised that, on October 25, 2006, the assistant State's Attorney and two police officers met with Loyola at her home to review the July 13, 2005, police report and that, "[w]hen Officer Gonzalez read aloud [from the police report] that Maria Loyola reported to the police that the bottle was 'red,'

Ms. Loyola responded in Spanish, and Officer Gonzalez translated that she had told the police officer that the bottle was green." On March 16, 2007, defendant also filed a motion to reconsider his sentence, to vacate or commute the sentence, and/or for a new trial.

On the same date, the trial court dismissed defendant's appeal on his own motion, pursuant to Supreme Court Rule 309 (134 Ill. 2d R. 309). It then heard argument on his March 9 and March 16 motions. Defendant argued that the supplemental discovery answer evidenced a contradiction by Loyola, the State's only eyewitness. He contended that this contradiction constituted impeachment evidence, materially favorable to him, and that he had been prejudiced by the State's failure to disclose it before trial. The court denied defendant's motions, finding that the color of the bottle was not material, that Loyola was "absolutely" credible, and that defendant was not at all believable. This timely appeal followed on April 16, 2007.

ANALYSIS

A. Jury Trial Right

Defendant first argues that his right to a jury trial was violated. Defendant alleges that he did not waive his right to a jury trial knowingly and understandingly and in open court, because it is a personal right that cannot be waived by his attorney. The State responds that defendant validly waived his jury trial right by remaining silent during his attorney's waiver of it and that defendant also waived his right to a jury trial in writing. We agree with the State.

Defendant concedes that he did not question the validity of the jury waiver in the trial court; rather, he raises it for the first time on appeal. Although this procedural history normally results in procedural default (In re R.A.B., 197 Ill. 2d 358, 362 (2001)), defendant asks us to review the issue under the plain error doctrine. Plain error review is permitted when either (1) the evidence is closely

balanced (regardless of the seriousness of the error) or (2) the error itself is so serious that the "integrity of the judicial process" is at stake (regardless of the closeness of the evidence). R.A.B., 197 Ill. 2d at 363. As defendant suggests, we will review his claim under the second prong, because of the fundamental nature of the right at stake. See People v. Bracey, 213 Ill. 2d 265, 270 (2004) ("Whether a defendant's fundamental right to a jury trial has been violated is a matter that may be considered under the plain error rule"). Our review is de novo because the facts are not in dispute and the issue of whether defendant validly waived his right to a jury trial is a question of law. R.A.B., 197 Ill. 2d at 362 .

The right to a jury trial is protected by the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, §8), and it has been codified by the Illinois legislature (725 ILCS 5/103--6 (West 2006)). Bracey, 213 Ill. 2d at 269. Our supreme court has construed the statute to mean that "a defendant validly waives his right to a jury trial only if [the waiver is] made (1) understandingly[] and (2) in open court." People v. Scott, 186 Ill. 2d 283, 285 (1999). The circuit court has a duty to ensure that a jury waiver is "made expressly and understandingly." People v. Smith, 106 Ill. 2d 327, 334 (1985). However, there is no constitutional requirement that the court apprise a defendant of the jury trial right, though this would be "preferable." People v. Steiger, 208 Ill. App. 3d 979, 981 (1991). Although a waiver should be in writing (see 725 ILCS 5/115--1(West 2006)), the lack of a writing may be harmless error. People v. Eyen, 291 Ill. App. 3d 38, 41 (1997). Conversely, the presence of a writing does not in and of itself establish the validity of a waiver. Scott, 186 Ill. 2d at 284 (holding that a written waiver alone is an invalid waiver). No set formula exists, and each case must be examined on its particular facts. R.A.B., 197 Ill. 2d at 364. "[T]he court need not impart to defendant any set admonition or advice."

Bracey, 213 Ill. 2d at 270. Still, our supreme court has "never found a valid jury waiver where the defendant was not present in open court when a jury waiver, written or otherwise, was at least discussed." Scott, 186 Ill. 2d at 285. A valid waiver exists if there is an express statement by defense counsel in open court, in the defendant's presence, without objection from him or her, that the defendant opts to waive his jury trial right in favor of a bench trial. People v. Elders, 349 Ill. App. 3d 573, 578 (2004); Eyen, 291 Ill. App. 3d at 41. Something in the discussion must indicate to the defendant that his or her right to a jury trial is being waived. See People v. Williamson, 311 Ill. App. 3d 54, 59 (1999).

Defendant only selectively cites the record to support his contention that there was error in that there was no discussion of a jury waiver in his presence. But defendant was advised at the arraignment on January 19, 2006, that he had the "right to a trial by judge or jury." He was present, in open court, on October 27, 2006, when his attorney indicated that defendant had chosen a bench trial and wanted to waive a jury trial. Defendant made no objection. Nonetheless, defendant contends that no waiver could have occurred as of October 27 because there was no discussion of it on October 27 and the court "merely reserved the issue for later discussion." Defendant then asserts that no discussion occurred on October 30 either.

Defendant's argument fails. As a preliminary matter we again note that defendant's briefs omit mention of the portion of the October 27 colloquy in which the court specifically stated: "I don't believe we've addressed Mr. Rincon as to a jury waiver. You're advising the court he wants to waive jury?" Defendant's attorney responded affirmatively. All of this occurred in defendant's presence in open court, without his objection, and prior to the court's reserving the matter. Immediately following this valid waiver, the court asked if defendant wanted "to reserve until Monday," October

30, and defense counsel indicated that defendant did. On October 30, defendant was again present in open court when the court, after ascertaining that defendant did not need an interpreter, said "Before I begin, I have been looking at the court file here today. Is this a bench trial?" Defense counsel responded affirmatively, without objection from defendant. This Monday, October 30, colloquy cannot be viewed in isolation; rather, it must be viewed in the context of the Friday, October 27, discussion. See Scott, 186 Ill. 2d at 286 (finding no valid jury waiver "[f]rom [the] context"). On Friday defendant waived a jury but accepted the court's offer to reserve the issue over the weekend, and on Monday he confirmed his jury waiver.

This conclusion is supported by People v. Frey, 103 Ill. 2d 327 (1984). In Frey, the defendant was indicted on two counts of reckless homicide stemming from an automobile accident on March 6, 1981. Frey, 103 Ill. 2d at 329. On October 8, 1981, the trial court entered an order continuing the case for bench trial and stating that defense counsel indicated that the defendant was waiving a jury. Frey, 103 Ill. 2d at 329. Subsequently, on January 27, 1982, the State filed an information charging the defendant with one count of driving while under the influence, based on the same accident. Frey, 103 Ill. 2d at 330. Sometime between then and the trial on March 18, 1982, the parties agreed to try the reckless homicide charges separately from the driving under the influence charge. Frey, 103 Ill. 2d at 330. On March 18, 1982, the defendant was present and did not object to the trial court's statement that "these causes were set today for purposes of bench trial." (Emphasis omitted.) Frey, 103 Ill. 2d at 331. The trial court then recognized the parties' agreement to try the charges separately. Frey, 103 Ill. 2d at 331. The defendant was acquitted of the reckless homicide charges but convicted the next day of driving under the influence. Frey, 103 Ill. 2d at 331. At a hearing on a motion for a new trial, in the defendant's presence, the prosecutor gave unrebutted testimony that the defendant

had been present during discussions of a bench trial and that "at some point was advised of his right to trial by a jury or by the court." Frey, 103 Ill. 2d at 330. Although this motion was apparently denied, the appellate court granted the defendant a new trial because it found no valid jury waiver. Frey, 103 Ill. 2d at 331-32.

The supreme court, however, reversed the appellate court. Frey, 103 Ill. 2d at 333. Despite the lack of a complete record of the pretrial proceedings, the court found from the orders in the common-law record and the prosecutor's testimony from the posttrial motion hearing that the defendant had been "present at some point prior to trial when the jury waiver was discussed." Frey, 103 Ill. 2d at 332-33. Adding the context of the defendant's silence on the day of trial when the court stated that all counts were set for a bench trial, the supreme court held that the defendant had validly waived his jury right. Frey, 103 Ill. 2d at 333.

As in Frey, defendant here was present in open court and did not object when the jury waiver was discussed on October 27. Defendant was also advised earlier at his arraignment that he had the right to a trial by jury or judge, as the Frey court concluded that the defendant there had been so advised "at some point." Moreover, the record before us provides even stronger support for finding a valid jury waiver, because here the discussion took place three days prior to trial, whereas in Frey it occurred months earlier. Furthermore, although the defendant in Frey apparently never signed a waiver, here defendant's signed jury waiver was filed on the day of trial. This underscores defendant's knowing waiver. Steiger, 208 Ill. App. 3d at 982 (noting that "the signed jury waiver *** lessens the probability that the waiver was not made knowingly").

Yet defendant argues that there was no discussion of the written waiver in open court and, hence, no confirmation by the court that the written waiver was actually signed by defendant. In fact,

his opening brief refers to the written waiver as "purportedly signed" by defendant. First, however, the law does not require such discussion or confirmation. See Bracey, 213 Ill. 2d at 270 ("[T]he court need not impart to defendant any set admonition or advice"). Rather, it is sufficient that there is " 'some affirmative statement by defendant's attorney, in his presence, that the defendant wishes not to exercise his right to a jury trial and, instead, chooses a bench trial' " (Elders, 349 Ill. App. 3d at 578, quoting People v. Roberts, 263 Ill. App. 3d 348, 351 (1994)), which there was at the October 27 hearing. Second, defendant advances no argument that the signature on the waiver is not his and cites no authority to support his contention that the State bore the burden of proving that defendant signed the waiver. We accept the record on its face and decline to speculate. The written waiver, though alone not dispositive, supports our finding that defendant made a valid waiver in light of the discussions held in his presence in open court.

Nonetheless, defendant asks us to find that the waiver made by his attorney was not binding. The right to a jury trial is a fundamental right of a criminal defendant, who has the "ultimate authority" to waive it. Jones v. Barnes, 463 U.S. 745, 751, 77 L. Ed. 2d 987, 993, 103 S. Ct. 3308, 3312 (1983); see People v. Segoviano, 189 Ill. 2d 228, 240 (2000). The right cannot be waived by a defendant's attorney "without the fully informed and publicly acknowledged consent of the [defendant]." See Taylor v. Illinois, 484 U.S. 400, 408-09, 418 n.24, 98 L. Ed. 2d 798, 810, 816 n.24, 108 S. Ct. 646, 652, 657 n.24 (1998). However:

"A defendant speaks and acts through his attorney; therefore, a trial court may rely on the defense attorney to execute his professional responsibilities. [Citation.] Thus, where the defense counsel informs the trial court of the defendant's desire to waive his right to a jury

trial, the defendant has knowingly and understandingly consented to the waiver. [Citation.]"

Steiger, 208 Ill. App. 3d at 981-82.

In the case at bar, on October 27, 2006, defendant was present in open court and did not object when his attorney informed the court that defendant chose to waive his jury trial right. Thus, defendant effectively waived his, albeit personal and fundamental, right to a jury trial.

Moreover, in People v. Tucker, 183 Ill. App. 3d 333 (1989), this court found a valid jury waiver on facts even less favorable to the State. In Tucker, the case was scheduled for a bench trial, and a jury waiver was to be taken on that same date. Tucker, 183 Ill. App. 3d at 334. The trial court asked, " 'Jury trial?' " Tucker, 183 Ill. App. 3d at 334. Defense counsel, in the defendant's presence and without his objection, responded, " 'No. Bench.' " Tucker, 183 Ill. App. 3d at 334. (There was no written waiver in that case, but it was not statutorily required at the time. Tucker, 183 Ill. App. 3d at 335.) Reasoning that "the trial court is entitled to rely on the defense attorney to execute his professional responsibilities," we affirmed that there was a valid waiver. Tucker, 183 Ill. App. 3d at 335. The case at bar contains a similarly valid waiver because defendant was present in open court when his attorney advised the court that he was waiving a jury trial.

All the same, defendant focuses on the October 27, 2006, discussion regarding scheduling for a bench versus a jury trial (asserting that reference to a bench trial in the context of a scheduling discussion does not constitute waiver), and the court's October 30 return to the State of its tendered jury instructions (maintaining that he reasonably could have believed that he had no choice about a jury trial since the court sua sponte returned the jury instructions, or that it was the State that opted to have a bench trial instead of a jury trial since it had tendered the instructions to the court in the first place). Defendant correctly asserts that neither the October 27 scheduling discussion nor the

court's return of the State's jury instructions on October 30 constituted a valid jury waiver. Yet defendant's argument misses the mark and, we note, omits relevant portions of the record. As discussed above, the October 27 explicit discussion of a jury waiver in open court resulted in a valid waiver, supported by the signed written waiver. Thus, the fact that neither the October 27 scheduling discussion nor the October 30 return of the State's jury instructions constituted a valid jury waiver is irrelevant.

Furthermore, we distinguish the cases cited by defendant in support of his contention that he did not validly waive his right to a jury trial. In People v. Thornton, 363 Ill. App. 3d 481 (2006), and People v. Williamson, 311 Ill. App. 3d 54 (1999), the appellate court held that references to a bench trial made only in the context of discussions of other matters were insufficient as jury waivers. In Thornton, the references to a bench trial were made only during discussions of continuances (Thornton, 363 Ill. App. 3d at 482-83), and, in Williamson, the bench trial references were merely in the context of scheduling discussions (Williamson, 311 Ill. App. 3d at 55-56). Similarly, in People v. Ruiz, 367 Ill. App. 3d 236, 238-39 (2006), reference to a bench trial occurred only in a scheduling discussion. Additionally, in Ruiz the appellate court held that the trial court's reference to the defendant's signed jury waiver did not constitute a "discussion" of the jury waiver. Ruiz, 367 Ill. App. 3d at 238-39. None of these cases involved an actual discussion of a jury waiver in defendant's presence in open court. Finally, People v. Elders, 349 Ill. App. 3d 573 (2004), is even less relevant because it involved an attempted retroactive waiver, secured after the finding of guilt. Elders, 349 Ill. App. 3d at 576-77. All of these cases are unlike our case, where defendant was admonished at the arraignment of his right to a trial by jury or judge and then, in defendant's presence at the final pretrial hearing in open court, the judge explicitly asked if defendant wanted

to waive a jury and his attorney answered in the affirmative without objection from defendant. As defendant entered a valid jury waiver, he has not established error, much less plain error.

### B. Sufficiency of the Evidence

Defendant argues that the trial court erred in finding him guilty of attempted arson because the State's evidence was insufficient to establish that he had the requisite intent and took a substantial step toward the commission of arson. Defendant contends that the evidence consisted solely of Loyola's unconvincing testimony, uncorroborated by other witnesses or by physical evidence. He argues that, in light of this weak evidence, his own testimony, and that of his alibi witnesses, a reasonable doubt existed as to his guilt. We find that the evidence was sufficient to convict beyond a reasonable doubt.

"When a court reviews the sufficiency of the evidence, it must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) People v. Phillips, 215 Ill. 2d 554, 569-570 (2005), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is the province of the fact finder to assess the credibility of witnesses, weigh the evidence, decide what inferences it supports, and settle any conflicts in it. People v. Ortiz, 196 Ill. 2d 236, 259 (2001). In a bench trial, it is the judge, as the trier of fact, who makes these determinations. People v. Mullen, 313 Ill. App. 3d 718, 724 (2000). We will neither retry defendant nor impose our judgment upon the trier of fact. People v. Cunningham, 212 Ill. 2d 274, 279 (2004); Ortiz, 196 Ill. 2d at 259.

Moreover, a complainant's testimony requires no corroboration and "need not be unequivocal." People v. Doll, 371 Ill. App. 3d 1131, 1138 (2007). In fact, "the identification of a

single witness is sufficient to sustain a conviction if the witness viewed the accused under circumstances that allowed a positive identification." Mullen, 313 Ill. App. 3d at 724. Factors to be considered in determining the sufficiency of the testimony of a single eyewitness include: "(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." People v. Slim, 127 Ill. 2d 302, 307-08 (1989). Finally, the trial court is not obligated to believe a defendant's alibi witnesses over the State's witnesses, especially where the defendant's witnesses are related to the defendant and failed to come forward during the initial investigation. Mullen, 313 Ill. App. 3d at 729.

The elements of attempt are an intent to commit the specific offense (here, arson) and the commission of an act constituting a substantial step toward that end. 720 ILCS 5/8--4(a) (West 2004). "A person commits arson when, by means of fire or explosive, he knowingly *** [d]amages any real property, or any personal property having a value of $150 or more, of another without his consent." 720 ILCS 5/20--1(a) (West 2004). Therefore, the State bore the burden of showing that defendant intended to damage by fire the truck in Loyola's driveway and took a substantial step toward that end. Intent must usually be inferred from the surrounding circumstances. People v. Moreira, 378 Ill. App. 3d 120, 129 (2007). Although "mere preparation" does not qualify as a substantial step, the State need not prove that "a defendant complete[d] the last proximate act in order to be convicted of attempt." People v. Smith, 148 Ill. 2d 454, 459 (1992). A fact-specific analysis is required; the facts can be placed on a "continuum between preparation and perpetration." People v. Terrell, 99 Ill. 2d 427, 434 (1984).

Defendant first argues that the testimony of the State's eyewitness, Loyola, was unconvincing and insufficient to establish his identity as the person with the lighter in Loyola's yard. The trial court stated that it believed Loyola's testimony, but found defendant's testimony and that of his alibi witnesses to be "somewhat incredible." These determinations were the proper province of the trial court, as finder of fact. Ortiz, 196 Ill. 2d at 259; Mullen, 313 Ill. App. 3d at 724. The court found that Loyola positively identified defendant as one of three persons in her front yard at 1:40 in the morning on July 13, 2005. It concluded that defendant tried to light a rag in a bottle (essentially, a Molotov cocktail) held by Rodriguez. Moreover, the court found that sparks were emitted. All of the factors to be used in evaluating a witness identification support Loyola's credibility. First, Loyola had a good opportunity to view defendant, as she had an unobstructed view of him in the yard, illuminated by the motion sensor light. Second, she had a high degree of attention since she was awake, concerned about the safety of her family, when the light was activated, and her identification therefore was not hindered by her just having awakened. Third, Loyola gave an accurate initial description, having known defendant for a few years and identifying him by his nickname at the time of her report to the police. Fourth, she had a high level of certainty, even describing his facial expression in detail. Finally, Loyola not only immediately identified defendant in her initial report, but she also identified him without hesitation one week later in the photo lineup and again at the trial. Whether Loyola had a motive to lie was a determination for the trial court as fact finder. It was in the best position to assess credibility, weigh the evidence, and resolve conflicting testimony. People v. Dominguez, 382 Ill. App. 3d 757, 771 (2008). The trial court found that the defense witnesses lacked credibility, being related to defendant and failing to have come forward earlier. See Mullen, 313 Ill. App. 3d at 729. Accordingly, we will not disturb the trial court's findings regarding

credibility, because a rational trier of fact could have found that Loyola was credible, while the defense witnesses were not.

Defendant next argues that the State failed to meet its burden of proving beyond a reasonable doubt that defendant had the intent to commit arson and that he took a substantial step toward that end. Defendant's intent could be inferred from his conduct. The evidence supports the finding that defendant was a Latin King who had driven by Loyola's residence while throwing gang signs and calling out a threatening gang slogan. The record reflects that in the past the Surenos had responded to this behavior with disrespectful gang signs. Defendant's testimony corroborated Gonzalez's testimony that gang members were expected to respond to disrespect with some form of intimidation, such as arson. Viewed in this context, defendant's presence in Loyola's yard at 1:40 a.m. and his attempts to light a Molotov cocktail support the reasonable inference that defendant intended to commit arson. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found the element of intent beyond a reasonable doubt.

Similarly, the evidence was sufficient to support the finding that defendant took a substantial step toward committing arson. Defendant was within throwing distance of the truck and had gotten as far as producing sparks while trying to light an incendiary device. Although the last proximate step would have been to throw the lit bottle at the truck, it was reasonable for the trial court to find that defendant had exceeded mere preparation and begun perpetration of arson.

Our conclusion that the State presented sufficient evidence to support a finding that defendant took a substantial step toward committing arson is supported by a factually similar case in which the appellate court found the evidence sufficient to sustain a conviction of attempted aggravated arson. In People v. Johnson, 102 Ill. App. 3d 122 (1981), the trial court found that the defendant threatened

to burn down the house of his former girlfriend, purchased gasoline, took it to the house, and poured it beside the foundation of the wood-frame structure. Johnson, 102 Ill. App. 3d at 126. He stopped pouring the gasoline when police arrived. Johnson, 102 Ill. App. 3d at 126. The appellate court held that the evidence was sufficient to support the defendant's conviction because "the only remaining step to be taken to complete the arson was the igniting of the gasoline." Johnson, 102 Ill. App. 3d at 126-27. This was true despite the fact that the defendant did not have a source of ignition on his person at the time. Johnson, 102 Ill. App. 3d at 127 (noting that it was just as consistent with the evidence to conclude that the defendant mistakenly believed he had an ignition source). Similarly, in the instant case, defendant stopped his attempt when Loyola screamed. A rational trier of fact could have found that, but for Loyola's intervention, defendant would have taken the last proximate step and thrown the lit bottle at the truck.

Our review indicates that the State presented sufficient evidence to find defendant guilty beyond a reasonable doubt of attempted arson. We thus see no reason to disturb the trial court's findings.

### C. Discovery

Defendant argues that the State violated Supreme Court Rule 412 (188 Ill. 2d R. 412) when it failed to disclose Loyola's contradiction of the police report regarding the color of the bottle used in the incident. According to defendant, this violation resulted in an unfair trial and a violation of his right to due process. He contends that, if defense counsel had known of the discrepancy regarding this material fact, he would have been able to impeach Loyola's testimony, thus creating reasonable doubt of defendant's guilt, especially since Loyola was the only eyewitness. Defendant additionally argues that prior knowledge of the discrepancy could have resulted in his opting for a jury trial and

that this is also a basis for finding that he was deprived of a fair trial. Therefore, defendant asserts that the trial court erred in denying his motions for a new trial.[2] The State concedes that it violated discovery rules by failing to disclose the discrepancy but asserts that it did so unintentionally. Moreover, the State maintains that the color of the bottle was not material, that defendant was therefore not prejudiced by the violation, and that a new trial is not warranted. We agree.

We review for abuse of discretion a trial court's denial of a motion for a new trial. People v. Brink, 294 Ill. App. 3d 295, 302 (1998). The parties cite People v. Turner, 367 Ill. App. 3d 490, 499 (2006), to support their assertion that we are reviewing for abuse of discretion the trial court's decision to deny a sanction for a discovery violation. One of the possible sanctions for a discovery violation where the defendant is denied a full opportunity to prepare his or her defense is the granting of a new trial (134 Ill. 2d R. 415(g); People v. Leon, 306 Ill. App. 3d 707, 713-14 (1999)). Thus, whether we characterize our review as being of the denial of a motion for a new trial or the denial of sanctions for a discovery violation, our review is for abuse of discretion. A trial court abuses its discretion only if its "decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." People v. Ortega, 209 Ill. 2d 354, 359 (2004).

The State has a duty to disclose evidence favorable to the defense. Brady v. Maryland, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963). Regardless of the State's good

---

[2]Defendant filed two motions as a result of the State's supplemental answer to discovery. The March 9, 2007, motion was for acquittal or for a new trial; the March 16, 2007, motion was to reconsider his sentence, to vacate or commute the sentence, and/or for a new trial. The trial court denied both motions on March 16, 2007.

or bad faith, the failure to disclose evidence that is "material either to guilt or to punishment" is a violation of a defendant's due process rights. Brady, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. The Brady rule encompasses not just exculpatory evidence, but also impeachment evidence. United States v. Bagley, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct. 3375, 3380 (1985); People v. Williams, 329 Ill. App. 3d 846, 857 (2002). Illinois has also codified the rule. 188 Ill. 2d R. 412(c). Our supreme court has held:

> "A Brady claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." People v. Beaman, 229 Ill. 2d 56, 73-74 (2008).

If a defendant can show that he suffered prejudice, unremedied by the trial court, a new trial may be the appropriate sanction for the discovery violation. People v. Cisewski, 118 Ill. 2d 163, 172 (1987). Materiality requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383; see also People v. Anderson, 375 Ill. App. 3d 990, 1011 (2007).

Here, the State's supplemental answer to discovery indicated that, when listening to the police report being read to her in October 2006, Loyola told Gonzalez that the bottle used in the incident was green, not red as entered on the police report. According to defendant, Loyola "changed her story": either she was an unreliable witness because she did not consistently report the bottle color or she categorically lied because of her gang bias. The State contends that Loyola consistently maintained

that the bottle was green and that the police officer entered the color incorrectly on the report. Regardless of its cause, the discrepancy could be used for impeachment and thus qualifies as evidence favorable to the defense. Moreover, the State conceded that it had a duty to disclose the discrepancy and that it had inadvertently breached that duty. Therefore, the burden remaining on defendant in making his Brady claim was to show that he was prejudiced because this evidence was material. Defendant maintains that, had he known about this evidence, he would have changed his trial strategy and aggressively cross-examined Loyola and might have requested a jury trial rather than a bench trial. He asserts that, because the evidence was closely balanced[3] and heavily dependent upon the testimony of Loyola, had he been able to discredit her testimony, the outcome of the trial likely would have been different.

At the hearing on defendant's motions for a new trial, the trial court expressly dismissed any chance that the outcome of the trial would have been different had defense counsel used the evidence to impeach Loyola:

"I don't see how it's material, counsel. I think what is important in this case was they had a bottle, not what its color was.

I can tell you that I observed Ms. Loyola's testimony and I believe her absolutely. I don't have any doubt that she told me the truth. And with all due respect to counsel, I certainly didn't believe your client at all. I certainly believed her. I don't see how this is material. I don't see how the result would have been different. You could have examined

---

[3]Defendant also argues that the evidence was insufficient, but we have already determined its sufficiency above.

her all afternoon on the difference in the color assuming that there, in fact, was a difference, I am not certain about that, but assuming even there was a difference, I don't see how that would have been impeaching, not as to a material matter.

What was important was that she saw this bottle, not what the color was."

The trial court properly exercised its discretion, as a reasonable person could agree that the bottle color discrepancy was not material. The trial court was in the best position to observe the witnesses and assess their credibility. The trial court stated that it was not even clear that there was a discrepancy, but assuming arguendo that there was, it found that Loyola was credible and that, even if defendant had cross-examined her on the color of the bottle, the outcome of the trial likely would not have been different.

This court addressed a similar issue of mistake regarding the color of an item in People v. Hoekstra, 371 Ill. App. 3d 720 (2007). Although Hoekstra involved review of the summary dismissal of the defendant's postconviction petition alleging ineffective assistance of counsel, the underlying issue was whether a witness's description of the defendant's van as blue, rather than green, invalidated its stop by police. Hoekstra, 371 Ill. App. 3d at 723. We held that the stop was valid because there were several other factors supporting it. Hoekstra, 371 Ill. App. 3d at 724 (finding that the timing of the stop, the location of the vehicle, and the defendant's conduct just prior to the stop supported its validity). Furthermore, we found that, because it was nighttime and therefore dark, and because both green and blue can be considered "dark colors," the mistake in color was not "fatal." Hoekstra, 371 Ill. App. 3d at 725. Similarly, in the instant case, other factors supported the finding of guilt. Defendant was identified as a Latin King and was positively identified as the man seen in the yard of a Sureno supporter, trying to light a Molotov cocktail that consisted of a bottle with a rag sticking

out of it. The color of the bottle had nothing to do with the actions of defendant. Further, even if Loyola had been confused about the color, her confusion was reasonable since both red and green are dark colors and it was nighttime. Therefore, the discrepancy had no effect on her observations of defendant's conduct or on the outcome of the trial.

Nonetheless, defendant contends that Loyola lied due to her gang bias and that the discrepancy is evidence of her lying. However, defendant concedes that he otherwise had adequate opportunity to cross-examine Loyola; indeed, he tried to impeach Loyola regarding her bias by focusing on the facts that she said she screamed, but no one woke up; that she had only a fleeting glimpse of the perpetrators; and that she waited to contact the police until the following afternoon. The record reflects that defendant made it patently clear during cross-examination that Sureno gang members (including Loyola's own two nephews), archrivals of the Latin Kings, often gathered in Loyola's yard. Loyola's alliance with Surenos supported defendant's contention that Loyola had a motive to lie, due to the gang rivalry. Thus, defendant attempted, albeit unsuccessfully, to impeach Loyola's credibility in several ways. Given that the trial court found all of this other evidence unpersuasive to impeach Loyola, it is unlikely that it would have found her not credible simply because of the bottle color.

A similar conclusion was reached in People v. Black, 207 Ill. App. 3d 304, 305 (1991), where following a bench trial the defendant was convicted of criminal sexual assault. The defendant argued that he was prejudiced by the State's discovery violation in failing to disclose a statement that the victim made to her examining physician. Black, 207 Ill. App. 3d at 307. That statement indicated that the victim had dated the codefendant a few times and that both the codefendant and the defendant were intoxicated at the time of the incident. Black, 207 Ill. App. 3d at 306-07. This was contrary to her testimony at trial where she stated that the codefendant had been a friend for about a month but

that they had never dated. Black, 207 Ill. App. 3d at 306. She also did not testify about the intoxication. Black, 207 Ill. App. 3d at 307. The defendant argued that he was prejudiced because, had he had this evidence, he would have been able to impeach the victim's credibility. Black, 207 Ill. App. 3d at 307. The appellate court found that the defendant had had ample opportunity to impeach the victim's credibility through the codefendant, who testified that he and the victim had dated for about a year and regularly engaged in sexual intercourse, and through a defense witness who testified that he had dated the victim and that she had told him that she had slept with the codefendant. Black, 207 Ill. App. 3d at 307-08. The court held that the defendant had "sufficiently presented this boyfriend/girlfriend impeachment angle to the trial court without success" and that the additional evidence likely would not have changed outcome of the trial. Black, 207 Ill. App. 3d at 308; see also People v. Harris, 123 Ill. 2d 113, 152 (1988) (finding a discovery violation but no prejudice, because the defendants had sufficient opportunity to impeach the witness). Likewise, in the case at bar, defendant had abundant opportunity to present his theory that Loyola was lying due to her gang proclivities, and the trial court similarly rejected that theory. Moreover, any discrepancy regarding the bottle color was even less likely to be material, since it was never the subject of actual trial testimony, unlike the undisclosed statement in Black.

Additionally, defendant asks us to find an abuse of discretion because he was denied a meaningful opportunity to decide whether he wanted a bench or a jury trial. We first note that defendant does not allege, and we see no reason to find, that he would have chosen a jury trial had he known about the evidence in question. Second, the cases cited by defendant to support his proposition are inapposite. In People v. Aguilar, 218 Ill. App. 3d 1, 3 (1991), after a bench trial the defendant was convicted of delivery of controlled substances. The appellate court found that the State

wilfully ignored the defendant's discovery request by not disclosing that the State's informant had been paid. Aguilar, 218 Ill. App. 3d at 9. When this fact was revealed during the police officer's testimony, the trial court granted the defendant a six-week continuance to prepare his defense in light of this testimony. Aguilar, 218 Ill. App. 3d at 9. The appellate court acknowledged that the continuance allowed the defendant to "obtain the same mileage" from the previously undisclosed evidence. Yet it reversed and remanded because the defendant had been "denied the full opportunity to prepare his defense and make tactical decisions with the aid of [the] information." Aguilar, 218 Ill. App. 3d at 10, 11. The court concluded that the defendant had suffered "extreme prejudice" because he may have chosen a jury trial, which could have resulted in a different verdict, rather than a bench trial. Aguilar, 218 Ill. App. 3d at 10.

In People v. Blackman, 359 Ill. App. 3d 1013, 1021 (2005), also cited by defendant, the court relied on Aguilar to hold that the trial court's offer of a continuance was insufficient to remedy the prejudice suffered by the defendant when the State failed to disclose that one of its key eyewitnesses had been paid $20,000 in relocation expenses. The Blackman court noted that the defendant could not have made "an informed and intelligent waiver of his right to a jury trial because the State violated the discovery rules" (Blackman, 359 Ill. App. 3d at 1021) by not disclosing a material fact (Blackman, 359 Ill. App. 3d at 1019).

Aguilar and Blackman are distinguishable from the case at bar. In those cases, the undisclosed evidence was material. Significantly, that evidence consisted of facts that established the existence of bias in the first place. In other words, the informant in Aguilar arguably had a bias in favor of the State because he was a paid police informant, and this evidence also supported the defendant's entrapment defense. Similarly, in Blackman, the witness had a bias in favor of the State because it

paid her relocation expenses. In contrast, the undisclosed evidence here consisted of a possible discrepancy in Loyola's description of the color of the bottle. This does not establish a bias. Rather, the defendant strenuously argued Loyola's possible bias at trial. He merely wants to add the color discrepancy to the bias evidence that he already presented at trial, in the hope that it would tip the scale in favor of Loyola's impeachment. The trial court concluded that the discrepancy would not have changed the outcome and thus that it was not material. While we do not condone the State's failure to disclose, defendant suffered no prejudice. Accordingly, we cannot say that the trial court abused its discretion in denying defendant's motions for a new trial.

For the reasons given, we affirm the judgment of the circuit court of Kane County.

Affirmed.

SCHOSTOK, J., concurs.

JUSTICE McLAREN, specially concurring:

I specially concur because I have a problem with the logic of the case law that suggests that a defendant may waive his individual right to a jury trial merely by remaining silent in open court while his attorney states that the right to a jury has been waived without referencing the fact that it was the decision of the defendant alone and not that of the attorney. I am aware that the law is well settled, but that does not make it logical. I submit that, if defense counsel had said in open court, without comment by the attending defendant, "I have discussed this with my client and he objected to the waiver, but I am waiving the right to a jury trial," the non sequitur and error would be readily apparent. (Note, the error is apparent even without the defendant's acknowledgment or establishing that the defendant knew the right to a jury trial was solely his right to waive.)

I would affirm the judgment of conviction and conclude that the record does not sustain defendant's burden of proof on appeal as required by our supreme court in <u>People v. Smith</u>, 106 Ill. 2d 327, 335-36 (1985). Defendant must establish plain error. He claims that he did not <u>knowingly</u> waive his right to a trial by jury. Based upon the record that defendant has provided, we have no way of knowing whether or not he <u>knowingly</u> waived the right to a jury trial. "Without that, we must assume that the record indications of a jury waiver are indeed based on a valid waiver." <u>Smith</u>, 106 Ill. 2d at 336.