No. 2--06--1304          Filed: 5-14-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--4978 |
| LUIS A. DOMINGUEZ, | ) ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial on April 5, 2006, defendant, Luis A. Dominguez, was convicted of one count of aggravated domestic battery (720 ILCS 5/12--3.2(a)(1), 12--3.3(a) (West 2004)) and one count of unlawful restraint (720 ILCS 5/10--3(a) (West 2004)). On December 4, 2006, the trial court denied defendant's posttrial motions and sentenced him to five years' imprisonment for the aggravated domestic battery conviction and two years' imprisonment for the unlawful restraint conviction, to be served concurrently. Defendant timely appealed and argues that we should reverse his convictions because the trial court erred in admitting: (1) the tape of the victim's 911 call for help, which constituted testimonial evidence; (2) the statements of Officer Thomas Poulos and paramedic Ryan Koncki; and (3) certain consistent statements made by the victim before the grand jury. Additionally, defendant argues that there was insufficient evidence to convict him of either crime. We affirm.

## I. BACKGROUND

The following facts are derived from the trial transcripts. The victim, Jennifer Cook, testified first for the State. Cook admitted that she was testifying by way of subpoena and did not want to be in court. On December 24, 2005, she and defendant went to the home of defendant's mother for a family Christmas celebration. Approximately 12 to 15 people were present, including the couple's three children. Cook drank two bottles of tequila and some wine coolers and became highly intoxicated. She believed that she went to bed at 3:40 a.m. but did not remember exactly. She did not remember at what time she first awoke and did not remember anything about the previous night. She went back to sleep and then awoke again around 9 a.m. The first thing she remembered was waking up next to defendant. At that moment, she did not realize that she was injured, and defendant was still asleep. The couple remained in bed and slept a little longer. At some point, Cook and defendant went to Cook's Chevy Trailblazer to leave. Cook began driving home and, when she looked in the mirror, she realized that her eyes were bruised and injured. She became angry and "assumed that [defendant] had did it." She yelled at defendant, and he tried to explain that he did not do it. Cook was still intoxicated and angry but could not remember what had happened. She told defendant to get out of the truck and hide in the backseat because he did not have identification to gain access to her apartment complex. After he got out, she drove off, leaving him on the street, and called 911 because she "assumed that he had did that to [her] and [she] was mad at him."

Cook identified the tape of the 911 call that she made on December 25, 2005. The State moved to publish the tape to the jury, and over defendant's objection the trial court admitted the evidence as an excited utterance. On the tape, Cook is frantic and crying. She told the 911 operator

that defendant caused her injuries overnight, that she first saw her injuries in her car mirror, and that this was her first chance to get away from defendant after he kept her overnight. She told the operator that she left defendant on the street and wanted the police to catch him so she could press charges. She repeatedly cried out that she could not believe these events were happening to her and that she did not want her children to see her like this. She stated that she did not know why defendant did this to her. When asked who injured her, she identified defendant. Cook then identified photographs that depicted her injuries, and those photographs were admitted into evidence.

After the 911 call was made, an officer responded and met Cook at the intersection of Elmwood and Dugdale in Waukegan. Cook could not recall having a conversation with Officer Poulos at the scene. She remembered going into an ambulance and informing the officer that she did not want to go to the hospital. Cook spoke to the responding paramedic, Ryan Koncki, but did not recall what she said to him. The ambulance took her to Victory Memorial Hospital, and while there Cook spoke to Officer Poulos. She told him that she could not recall what had happened. She recalled only drinking with the family the night before.

She did not remember telling Officer Poulos that defendant kept her in his bedroom all night, that defendant put his whole hand down her throat, or that she had passed out. When asked, "So you are not telling the *** jury that it did or did not happen? You are just saying you don't recall?," Cook stated that she did not recall anything. She could not recall telling Officer Poulos that, when she awoke, defendant was still there, would not allow her to leave, and held her against her will. Cook could not recall telling Koncki that defendant assaulted her and that she then passed out. The State then introduced the written statement that Cook signed for Officer Poulos. She identified her signature and admitted that she wrote the statement. However, she stated that Officer Poulos told

her what to write. Over defendant's objection, the statement was admitted pursuant to section 115--10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--10.1 (West 2006)).

The State then questioned Cook regarding her previous grand jury testimony. The questioning developed as follows:

"Q. Do you recall testifying in front of the Lake County Grand Jury on January 25, 2006?

A. Yes, I do.

Q. Do you remember a question when you woke up--do you remember what happened when you woke up? Your response was, I seen my face. And question, what did it look like? Answer, it was bruised up. Question, you looked in the mirror and saw your face. It was badly bruised? Answer, yes. Question, and your eyes sort of swollen shut? Answer, yes. Question, sort of hard to see out of them? Answer, yes. And who was in the room with you when you woke up? Answer, its [sic] just me and [defendant]. Do you recall that testimony?

A. Yes.

Q. When you gave that testimony was your recollection different than it is today?

A. No, it's not any different. At the grand jury they didn't ask me if I got into my truck. They just asked me what happened. I did not give them details.

Q. But your testimony is today that you first noticed your injuries when you got into your truck?

A. Yes. That was the mirror that I looked in.

* * *

Q. Question, you and [defendant] what you said and then [sic] did you want to leave at this point? Answer, yes. I wanted to go home and collect myself and take a shower. What did [defendant] say? He wanted to come with me. And so you really--and so did you really want him to come with you? Answer, no. Question, but he insisted he was going to come with you, right? Answer, he insisted, but he didn't force himself to come with me. I just said fine, you know, because I wanted to leave. Question, you just wanted to leave and then you got in your car and [defendant] came with you, right?

[Defendant objected to reading into evidence the entire transcript. The trial court advised the State to slow down and give the witness an opportunity to answer.]

Q. You indicated I believe with a nod. Do you remember that testimony?

A. Yes, I do.

Q. Next question, when you went over to your apartment in Whispering Oaks did you have identification to get in? Your answer, right. Question, and [defendant] didn't--

[Objection to reading of questioning overruled.]

Q. Question, and [defendant] didn't have any ID on him? Answer, no. Question, what was your plan then? Do you remember this part like did you tell [defendant] why don't you get in the back and lie down low and the security won't see you? Your answer, yes. Question, and when [defendant] opened the door to get out do you recall then that you just drove away? Your answer, yes. Question, so you didn't really give [defendant] a chance to get back in the car, did you? Your answer, no. *** Do you recall that testimony?

A. Yes."

Upon cross-examination, Cook admitted to consuming more than 10 shots of tequila and passing out around 3:40 a.m. She did not recall defendant hitting her. Her children were sleeping in their grandmother's room and she did not see them before she left. She planned to go home and shower. When she realized that she was injured, she became angry because she could not remember how or when it happened. She assumed that defendant had caused her injuries, because he was the first person she saw in the morning. At the hospital, she did not want to make the written statement, because she was still intoxicated and could not remember what had happened. She did so because she felt intimidated by the police. She admitted to having an ongoing relationship with defendant and that she loved him. She stated that she was not scared of him at all.

The State then attempted to admit portions of the grand jury testimony as inconsistent testimony. The trial court denied admission as substantive evidence, because the testimony was not inconsistent with her trial testimony. The trial court then provided the jury with a limiting instruction explaining that evidence of Cook's prior inconsistent statements to Officer Poulos and Koncki could be considered for the limited purpose of deciding the weight to be given the trial testimony.

The State then called Waukegan police officer Thomas Poulos. Officer Poulos responded to the domestic battery call on December 25, 2005. He arrived at the intersection of Dugdale and Elmwood to find Cook in her vehicle. She had blood on her face and chin and an abrasion on her forehead. She also had some swelling on her forehead, her eyes were swelled almost shut, and she had bruises on both sides of her face. Over defendant's objection, Officer Poulos recounted what Cook told him about her injuries. She was at defendant's home the night before and, during the overnight hours, he became upset with her. Defendant took her into a bedroom, beat her, choked her,

and, when she tried to scream, he stuck his entire fist down her throat. He punched Cook and then she passed out. When she woke up, defendant was still in the bedroom and would not allow her to leave. When describing these events, Cook was upset and yelling. Officer Poulos called for an ambulance, which arrived and took Cook to Victory Memorial Hospital. Officer Poulos went to the hospital as well and spoke to Cook again. She was calmer at that point. He asked Cook to make a handwritten statement, and in court he identified her statement. He confirmed that she wrote and signed the statement. Officer Poulos did not tell Cook what to write, did not intimidate her, and did not threaten her in any way. On cross-examination, Officer Poulos denied smelling alcohol on Cook or believing that she was intoxicated. Only at the hospital, when Cook told him that she drank a lot the night before, did he become aware that she had consumed alcohol.

The State moved to admit the statements that Cook made to Officer Poulos as substantive evidence under the excited-utterance exception. The trial court denied that motion, stating that the statements may serve to impeach only.

Koncki, the paramedic who responded to Cook's call, testified next for the State. At the scene, Koncki spoke with Cook. She told him that her boyfriend had assaulted her and that she had passed out or lost consciousness. He observed significant trauma to her face. Both eyes were badly swollen and the area around the forehead and eye was also swollen. Cook was crying and very upset. She expressed concern about her kids. He did not recall smelling alcohol on Cook. The State moved to admit Cook's statements to Koncki as substantive evidence of treatment by a medical provider. The trial court denied this motion.

Two stipulations were entered into evidence. The first stipulation regarded a hospital physician stating that Cook admitted that she had consumed alcohol the night before. The second

was that a CT scan of Cook's face revealed extracranial soft tissue swelling in the left orbital region extending to the left frontal and parietal region and nasal fractures of uncertain chronicity. The jury then returned guilty verdicts for both the aggravated domestic battery and the unlawful restraint offenses.

## II. ANALYSIS

### A. The 911 Tape

Defendant raises two contentions pertaining to the admission of the 911 tape: (1) the tape was testimonial evidence and its admission violated the confrontation clause because Cook was effectively unavailable for cross-examination; and (2) even if the tape did not violate the confrontation clause, it did not qualify under the excited-utterance exception to the hearsay rule.

The first question before us is whether the 911 tape contains testimonial statements that trigger confrontation-clause protections. We review this issue de novo as the question is one of law and does not involve the trial court's discretion that is typical of most evidentiary rulings. People v. Melchor, 376 Ill. App. 3d 444, 451 (2007). The Supreme Court, in recent years, has modified its confrontation-clause analysis, abandoning a reliability analysis and adopting a "testimonial" analysis. In Crawford v. Washington, 541 U.S. 36, 40, 158 L. Ed. 2d 177, 185-86, 124 S. Ct. 1354, 1357-58 (2004), the Court considered a conviction that was based largely on statements the defendant's wife made during an interview while in police custody. The defendant's wife did not testify at his trial, because she invoked the spousal privilege. Crawford, 541 U.S. at 40, 158 L. Ed. 2d at 185, 124 S. Ct. at 1357. After a lengthy historical analysis of the confrontation clause's purpose, the Court concluded that (1) the clause was particularly directed at preventing the use of ex parte examinations as evidence against the accused, and (2) testimonial statements of witnesses absent from trial may

be admitted only where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. Crawford, 541 U.S. at 50, 53-54, 158 L. Ed. 2d at 192, 194, 124 S. Ct. at 1363, 1365. The Court held that the statements made by the defendant's wife to the police were testimonial. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. However, the Court declined to comprehensively define what constituted "testimonial" and instead limited its holding to at minimum "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," as those practices are most akin to the abuses at which the clause was directed. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

The Supreme Court revisited the definition of "testimonial statements" in Davis v. Washington, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006). In Davis, the Court considered testimonial statements in two companion cases. In the first case, the victim of a domestic disturbance, Michelle McCottrey, made statements to a 911 operator. Davis, 547 U.S. at 817, 165 L. Ed. 2d at 234, 126 S. Ct. at 2270-71. During the conversation, McCottrey reported the defendant's name, that he was in the home, and that he was using his fists. Davis, 547 U.S. at 817, 165 L. Ed. 2d at 234, 126 S. Ct. at 2271. Eventually, McCottrey reported that the defendant ran out of the house and was leaving in a car with someone else; the 911 operator then posed a series of questions to gather information about the defendant. Davis, 547 U.S. at 817, 165 L. Ed. 2d at 234, 126 S. Ct. at 2271. McCottrey did not testify at the defendant's trial, and the trial court allowed into evidence the portion of the 911 tape in which she identified the defendant, concluding that it was not testimonial. Davis, 547 U.S. at 817, 165 L. Ed. 2d at 235, 126 S. Ct. at 2271.

In the companion appeal, another victim of a domestic disturbance, Amy Hammon, made statements to police after they responded to a report of a disturbance at the home. Davis, 547 U.S.

at 819, 165 L. Ed. 2d at 235, 126 S. Ct. at 2272. The police arrived at the scene to find Hammon sitting on the front porch and the defendant inside the home with broken glass and a gas heating unit engulfed in flames. Davis, 547 U.S. at 819, 165 L. Ed. 2d at 235, 126 S. Ct. at 2272. The police spoke to Hammon apart from the defendant and had her sign an affidavit, but she then did not show up to testify at the trial. Davis, 547 U.S. at 820, 165 L. Ed. 2d at 235-36, 126 S. Ct. at 2272.

The Supreme Court held that McCottrey's 911 taped statements were not testimonial but Hammon's statements to police were testimonial. Davis, 547 U.S. at 829, 165 L. Ed. 2d at 241-42, 126 S. Ct. at 2278. The Supreme Court again declined to provide an exhaustive list of all statements that might conceivably be regarded as "testimonial" but applied a primary-purpose test to distinguish the two statements there from the defendant's wife's statements in Crawford. The Court specifically disregarded any distinction between police and 911 operators and held that, for analytical purposes, 911 operators were law enforcement agents. Davis, 547 U.S. at 823 n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2. The Court noted that the primary purpose of McCottrey's statements was to "describe current circumstances requiring police assistance" and not to establish or prove some past fact. Davis, 547 U.S. at 827, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. In comparing Davis and Crawford, the Court stated that "any reasonable listener would recognize that McCottrey (unlike Sylvia Crawford) was facing an ongoing emergency," that McCottrey was describing events as they were actually happening, and that the elicited statements were necessary to resolve the present emergency rather than simply to learn about past events. Davis, 547 U.S. at 829, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. Further, there was a striking difference in the level of formality involved in the Crawford police interrogation, which was held at the police station after the defendant's wife was given Miranda warnings, and McCottrey's frantic phone call. Davis, 547 U.S. at 829, 165 L. Ed.

2d at 240, 126 S. Ct. at 2276-77. Therefore, McCottrey's identification of the defendant to the 911 operator was not considered testimonial. Davis, 547 U.S. at 829, 165 L. Ed. 2d at 240, 126 S. Ct. at 2277. However, the Court cautioned that a statement that began with a primary purpose of resolving an emergency could evolve into a testimonial statement and that some statements may require redaction. Davis, 547 U.S. at 828-29, 165 L. Ed. 2d at 241, 126 S. Ct. at 2277.

Hammon's statements, on the other hand, were elicited under conditions similar to those in Crawford. The Court determined that Hammon's emergency was over by the time the police arrived, and the primary purpose of their interrogation of Hammon was to investigate past events. Davis, 547 U.S. at 830, 165 L. Ed. 2d at 242, 126 S. Ct. at 2278. Further, Hammon initially said that things were fine, and the police continued to question her, eventually separating her from the defendant in the kitchen to continue asking her questions. Davis, 547 U.S. at 830, 165 L. Ed. 2d at 242, 126 S. Ct. at 2278. Therefore, Hammon's statements were deemed testimonial. Davis, 547 U.S. at 830, 165 L. Ed. 2d at 242, 126 S. Ct. at 2278.

The Illinois Supreme Court fashioned the United States Supreme Court's analysis of testimonial evidence into a two-component test derived from the definition of "testimony" as "solemn declarations for the purpose of establishing or proving some fact germane to the defendant's prosecution." People v. Stechly, 225 Ill. 2d 246, 280-81 (2007). Thus, the two components are that statements (1) must be made in a solemn fashion and (2) must be intended to establish a particular fact. Stechly, 225 Ill. 2d at 281-82. When examining solemnity, the United States Supreme Court was divided: the majority in Davis believed solemnity was established by the potential consequences of lying to a police officer whereas the dissent believed it was established if the statements were made in a setting with a higher degree of formality and possibly including Miranda warnings.

Stechly, 225 Ill. 2d at 282. Regardless, when examining the intent of a statement made to the police or an agent of the police, the "focus is on whether *** the witness was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred." Stechly, 225 Ill. 2d at 282. Further, the focus must be on the intent of the questioner in eliciting the statement and not on the intent of the declarant. Stechly, 225 Ill. 2d at 284-85. We must rely on the objective circumstances surrounding the statement and not on testimony regarding the questioner's subjective intent. Stechly, 225 Ill. 2d at 285.[1]

Applying these factors and the objective circumstances surrounding Cook's phone call, we find that the 911 tape was not testimonial. Any reasonable listener of the 911 tape would conclude that Cook was facing an ongoing emergency and was describing events as they were unfolding. While her injuries may have occurred during the overnight hours, as defendant argues vehemently, Cook did not become cognizant of her injuries until she was able to break away from defendant and entered her vehicle. Unlike the formal interviews police posed in Crawford and to Hammon in Davis, Cook's conversation with the 911 operator was not calm, formal, or controlled but was more akin to McCottrey's frantic call in Davis. Cook was crying and hysterical as the operator attempted to gather details on the current circumstances that required police assistance. Specifically, the operator elicited from Cook why she was fleeing defendant, what her injuries were, where she was

_____

[1]Ultimately, Stechly involved statements made to a nongovernment officer or agent. In analyzing statements made outside the context of police interrogation, the Stechly court looked to the intent of the declarant, asking whether the objective circumstances would have led a reasonable person to conclude that his or her statement could be used against the defendant. Stechly, 225 Ill. 2d at 289.

located, and where she left defendant. The 911 operator's obvious intent was to determine where police should be dispatched and what potential threat Cook or the police may be facing. Under this analysis, the 911 tape was not testimonial evidence.[2]

Having determined that the 911 tape was not testimonial and does not implicate the confrontation-clause protections, we are left to address defendant's second argument--that Cook's statement did not qualify as an excited utterance because Cook had "ample time to reflect" and there was no startling event that occurred at the time of the 911 call. The trial court's evidentiary ruling may not be reversed absent an abuse of discretion. People v. Richardson, 348 Ill. App. 3d 796, 801 (2004). "To secure admission of a 'spontaneous declaration' or 'excited utterance,' the proponent of the evidence must demonstrate: (1) the occurrence of an event or condition sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement relating to the circumstances of the occurrence." People v. Smith, 152 Ill. 2d 229, 258 (1992). No one factor is determinative and each case must rest on its own facts. People v. Gwinn, 366 Ill. App. 3d 501, 517 (2006).

On the first factor, defendant's argument would make sense if we were to accept that the only startling event was the overnight physical abuse that Cook endured. However, defendant overlooks the fact that, after regaining consciousness the next morning, Cook's realization that she had been abused and defendant's refusal to allow her to leave were startling events separate from the actual physical violence. Second, the supreme court has stated that "we do not require the time between when the startling event occurs and when the declarant makes statements in response to that event

_____

[2]Defendant argues on appeal that the entire 911 tape was testimonial. Therefore, we address the tape in whole and do not need to examine each statement made.

to be contemporaneous." Smith, 152 Ill. 2d at 259-60. Rather, the proper question is whether the statement was made while the excitement of the event predominated. Smith, 152 Ill. 2d at 260. Here, it is significant that Cook has consistently stated that she did not realize that she was injured until she saw her face in her car's mirror. Cook called 911 moments after that realization and moments after breaking free from defendant. Lastly, the statement she made to the 911 operator was clearly relating to the entire occurrence, including the events the night before, passing out, waking up to the injuries, and defendant's refusal to let her leave. Based on the entire set of facts and circumstances, we find that all three elements of an excited utterance have been met. Therefore, the trial court did not abuse its discretion in admitting the 911 tape.

### B. Cook's Statements to Officer Poulos and Paramedic Koncki

Defendant next argues that the State failed to lay a proper foundation when it impeached Cook with her prior statements to Officer Poulos and Koncki. However, defendant failed to object at all to the State's line of questioning of Officer Poulos and Koncki and did not object on foundational grounds during the State's questioning of Cook. Further, defendant did not raise or discuss plain error in his briefs. Therefore, these issues have been waived. People v. Daniels, 331 Ill. App. 3d 380, 388 (2002).

### C. Cook's Handwritten Statement

Defendant argues that the trial court erred in admitting Cook's handwritten statement pursuant to section 115--10.1 of the Code (725 ILCS 5/115--10.1 (West 2006)), because the "content of the handwritten statement is not a description of an event about which the declarant had personal knowledge." Defendant claims the problem with the statement was that, according to Cook's trial testimony, Officer Poulos told Cook what to write. We disagree.

As stated earlier, the trial court's evidentiary rulings may not be reversed absent an abuse of discretion. <u>Richardson</u>, 348 Ill. App. 3d at 801. Section 115--10.1 provides that a prior inconsistent statement is not inadmissible by the hearsay rule if:

"(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement--

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." 725 ILCS 5/115--10.1 (West 2006).

Cook's handwritten statement consisted of the following:

"[Defendant] held me *** all night in his bedroom. Put his whole hand down my throat. Passed out. I finally got away when [defendant] got out of the truck to go in the back

-15-

seat becuz [sic] you need an Id to get in Whispering Oaks. That's when I drove off and called 911."

The fact that Cook changed her testimony at trial, and explained away the statement by stating that Officer Poulos told her what to write, does not negate the fact that the events described were within Cook's personal knowledge. Officer Poulos was not at defendant's home the night before and was not in Cook's truck that morning, but Cook was. Therefore, the events described in the statement were within Cook's personal knowledge. The other section 115--10.1 requirements were also met: (1) the statement conflicted with Cook's trial testimony; (2) Cook was present for cross-examination; and (3) at trial Cook acknowledged writing and signing the statement. Defendant argues, without any support, that Cook was unavailable for cross-examination because she could not recall anything while on the witness stand. We disagree. While on the witness stand, Cook answered questions regarding the statement. She admitted to writing and signing the statement at the hospital and explained why she now was changing her story. Cook testified that her statement was the result of her assumption that defendant caused her injuries. She also stated that Officer Poulos told her exactly what to write and intimidated her. These inconsistencies were for the trier of fact to resolve. Therefore, Cook was obviously available for cross-examination regarding the statement, and the trial court did not err in admitting the statement pursuant to section 115--10.1 of the Code.

### D. Grand Jury Testimony

The trial court admitted as substantive evidence only the portion of the earlier quoted grand jury testimony that conflicted with Cook's trial testimony. Specifically, it admitted only the portion about how Cook woke up and saw her face in the mirror, because at trial Cook stated that she saw

her face in her vehicle's mirror. Defendant argues that the State should not have been allowed to read the consistent portions of Cook's grand jury testimony, because prior consistent testimony serves only to bolster a witness's credibility. However, defendant has failed to address how the introduction of the grand jury testimony constitutes reversible error. The superfluous testimony concerned three facts: (1) that Cook left defendant's mother's home with defendant on December 25, 2005; (2) that Cook asked defendant to get out of her truck and to get into the backseat; and (3) that Cook drove off when defendant stepped out of the truck. Cook had already testified to these facts and these events were not disputed during defendant's trial. It is unlikely that defendant would have been acquitted based on the facts and evidence of the case barring these three consistent grand jury statements. Therefore, the admission of these three potentially bolstering statements did not constitute reversible error. See People v. Engle, 351 Ill. App. 3d 284, 289 (2004) (finding erroneously admitted bolstering statements did not constitute reversible error but were merely cumulative of witness's testimony, and it was unlikely that the jury would have acquitted the defendant barring the statements).

### E. Insufficiency of the Evidence

Having determined that the trial court did not make any reversible evidentiary errors, we now turn to defendant's insufficiency of the evidence arguments. Defendant argues that the State failed to prove him guilty of aggravated domestic battery, because Cook was intoxicated and did not actually know that defendant caused her injuries. Defendant further argues that Cook did not testify that defendant held her against her will, and there was no other evidence to prove that he did. We disagree on both points.

When reviewing a challenge to the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Wheeler, 226 Ill. 2d 92, 114 (2007). The critical inquiry in reviewing the sufficiency of the evidence is whether the record evidence could reasonably support a guilty finding, regardless of whether the evidence is direct or circumstantial and whether the trial was by bench or jury. Wheeler, 226 Ill. 2d at 114. Because the trier of fact is best positioned to judge the credibility of witnesses and resolve disputes in the evidence, its decision is entitled to great deference. Wheeler, 226 Ill. 2d at 114-15. Thus, we do not retry the defendant when evaluating the sufficiency of the evidence and will reverse only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. Wheeler, 226 Ill. 2d at 115.

Under those parameters, we first review defendant's aggravated domestic battery conviction. According to section 12--3.3(a) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12--3.3(a) (West 2004)), in order to prove a defendant guilty of domestic battery, the State must prove that the defendant (1) intentionally or knowingly, (2) without legal justification, (3) caused great bodily harm or permanent disability or disfigurement (4) to any family or household member. Section 112A--3(3) of the Code of Criminal Procedure provides that a "family or household member" includes "persons who have had a dating or engagement relationship." 725 ILCS 5/112A--3(3) (West 2004). In this case, it is undisputed that defendant and Cook had a dating relationship for several years. It is also undisputed that Cook sustained serious injuries to her face, which were apparent in the photographs and in the stipulation to the radiologist's CT report. However, defendant argues that the State did not prove that he caused Cook's injuries. We disagree

based on the evidence presented by the State, including Cook's 911 call in which she identified defendant as the person who beat her, her written statement to the police, and her statements to Officer Poulos and the paramedic. The trier of fact was in the best position to weigh Cook's prior inconsistent statements against her trial testimony and to make a credibility determination. The 911 tape alone contained enough information to convict defendant of aggravated domestic battery. On the tape, Cook identified defendant as her attacker, stating that he held her overnight and beat her face and that she could not even see anymore. She frantically stated that she was not able to even see herself or get away until "now." The jury reasonably could have determined that Cook's 911 call and statements to police were more credible than her courtroom testimony in which she denied remembering anything. Therefore, there was sufficient evidence presented by the State to convict defendant of aggravated domestic battery.

Unlawful restraint requires that the State prove that the defendant knowingly and without legal authority detained another. 720 ILCS 5/10--3(a) (West 2004). Based on Cook's 911 call, the State presented evidence sufficient to convict defendant of unlawful restraint. On the tape, Cook stated that defendant held her overnight and that she just now had gotten away. Her written statement also claimed that defendant "held [her] all night in his bedroom" and that she got away when defendant got out of her truck to go into the backseat. Therefore, based on these statements, the trier of fact reasonably could have found defendant guilty of unlawful restraint.

### III. CONCLUSION

In conclusion, we find that the 911 tape was not testimonial and was properly admitted as an excited utterance. We further find that the trial court did not err in admitting Cook's handwritten statement pursuant to section 115--10.1. Defendant waived his foundational arguments regarding

Cook's statements to Officer Poulos and paramedic Koncki by failing to object at trial. Defendant also failed to establish reversible error in admitting prior consistent portions of the grand jury testimony. Finally, we find that the State presented sufficient evidence to support defendant's convictions of aggravated domestic battery and unlawful restraint.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

GROMETER and CALLUM, JJ., concur.