**Certiorari Granted, No. 31,813, July 29, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-079**

**Filing Date:  June 12, 2009**

**Docket No.  28,018**

**STATE OF NEW MEXICO,**

>       **Plaintiff-Appellant,**

**v.**

**JOSEPH SOLIZ,**

>       **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Joel Jacobsen, Assistant Attorney General
Albuquerque, NM

for Appellant

Hugh Dangler, Chief Public Defender
Adrianne R. Turner, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## OPINION

**VANZI, Judge.**

**{1}**    This interlocutory appeal follows from the district court's pre-trial ruling that Celina Gallegos's (Gallegos) statements to a 911 operator that Joseph Soliz (Defendant) had just violently attacked her were inadmissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution.  The district court appears to have concluded

1

that Gallegos's statements during the 911 call were testimonial in nature, pursuant to *Davis v. Washington*, 547 U.S. 813 (2006), and thus the transcript of Gallegos's 911 call is inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004). We reverse and, without ruling on any other facet of the admissibility of Gallegos's statements, hold that her statements during the 911 call are nontestimonial in nature and thus do not violate Defendant's rights under the Sixth Amendment.

**BACKGROUND**

**{2}** Defendant was indicted by a grand jury in the Third Judicial District Court on the following four counts: one count of aggravated battery against a household member with a deadly weapon; two counts of aggravated assault against a household member with a deadly weapon; and one count of battery against a household member. Defendant was subsequently arraigned and entered a plea of not guilty.

**{3}** The charges against Defendant stemmed from events occurring on June 25, 2006. On that date, Gallegos (Defendant's girlfriend and cohabitant) initiated a 911 call from a neighbor's house and, in the course of that call, reported that Defendant had just violently attacked her with a heavy metal pole. The seven-page transcript of that call, which Defendant agreed was authenticated and accurate, is attached as an appendix to this opinion.

**{4}** Defendant was successfully indicted and scheduled for trial. However, repeated attempts by both the State and counsel for Defendant to contact Gallegos and secure her participation as a witness in the criminal prosecution of Defendant failed. As a result, the district court excluded Gallegos as a witness. The parties do not contest this ruling and do not dispute that Gallegos was unavailable.

**{5}** In light of Gallegos's unavailability, Defendant submitted two separate motions in limine. The motions are premised on a single underlying legal assertion: that Gallegos's statements during the 911 call are testimonial, as defined in *Davis*, and thus the transcript in its entirety is inadmissible pursuant to *Crawford*. During the hearing on the first motion, the State maintained that the transcript was admissible up to page five, up to the point at which Gallegos provides the 911 operator a call-back number. Up to that point, the State claimed that Gallegos's statements concerned an ongoing emergency and thus were nontestimonial and posed no Confrontation Clause problem. The State was unconcerned with the portions of the transcript following page five as, the State contends, it contains mere "repetition." The district court ruled that it would "allow the admission of the [911] tape up to page five" and set a hearing for argument concerning further redaction of the content of those five pages.

**{6}** During the second hearing, Defendant reasserted his objection, citing *Crawford* and *Davis*, that the transcript is inadmissible in its entirety. In the alternative, and in light of the district court's ruling that the first five pages of the transcript of the 911 call were admissible, Defendant sought redaction of certain statements recorded in those five pages.

Pursuant to Defendant's argument in the alternative, the district court began evaluating the transcript line-by-line and found certain statements made by Gallegos inadmissible. However, the parties' disagreement over the meaning of *Davis* and the application of the principles announced therein soon became intractable. Accordingly, the district court discontinued its line-by-line examination and, presumably persuaded by Defendant's arguments, reversed its previous ruling and summarily concluded—without explanation—that the transcript was inadmissible in its entirety. In response to this ruling, the State requested certification for interlocutory appeal. That request was granted and forms the basis of this appeal.

## DISCUSSION

### Standard of Review

{7}     The State's interlocutory appeal requires us to review the admissibility of Gallegos's statements, as recorded in the 911 transcript, in light of Defendant's objections that admission of those statements would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution. "We apply a de novo standard of review as to the constitutional issues related to [the d]efendant's rights under the Confrontation Clause." *State v. Massengill*, 2003-NMCA-024, ¶ 5, 133 N.M. 263, 62 P.3d 354.

### The Sixth Amendment and *Crawford*

{8}     The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court's Sixth Amendment jurisprudence was altered fundamentally following the issuance of *Crawford*. There, after a lengthy discussion of the history of the Sixth Amendment, the Court concluded that "where testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. Thus, the *Crawford* Court held that when the declarant is unavailable, out-of-court statements that are testimonial are inadmissible even if they meet an exception to the hearsay rules. *Id*. at 54. In the present matter, it was undisputed that Gallegos is unavailable and Defendant had not had an opportunity to cross examine her. The question we must resolve, then, is whether Gallegos's statements during the 911 call (as recorded in the transcript of that call) are testimonial in nature.

{9}     In *Crawford*, the United States Supreme Court did not establish a comprehensive definition for the term "testimonial," 541 U.S. at 68, a necessary prerequisite to provide courts adequate guidance in identifying a testimonial statement. Rather, it left "for another day any effort to spell out" such a definition and concluded that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The issue presented in *Davis*—"whether . . . [an] interrogation that took place in the course of [a] 911 call produced

3

testimonial statements," *Davis*, 547 U.S. at 826—required the Court to "more precisely" define the term testimonial and the qualities that render a statement testimonial in nature. *Id.* at 822.

**{10}** This Court and our Supreme Court have previously adopted and discussed the principles established in *Davis*. *See*, *e.g.*, *State v. Lopez*, 2007-NMSC-037, ¶¶ 20-21, 142 N.M. 138, 164 P.3d 19 (discussing the admissibility of non-testifying co-defendants' custodial statements); *State v. Romero*, 2007-NMSC-013, ¶¶ 4-17, 141 N.M. 403, 156 P.3d 694 (evaluating an unavailable witness's statements to a sexual assault nurse examiner in light of *Davis* and concluding that the statements in question were testimonial in nature). The present matter, however, requires us, as a matter of first impression, to evaluate the principles announced in *Davis* in the context of statements elicited during a 911 call. As it is from *Davis* that we derive analytical guidance to resolve the current matter, it is to *Davis* we turn.

### *Davis* **and the Definition of Testimonial**

**{11}** *Davis* consolidated two appeals: *Davis v. Washington*, a case from the Supreme Court of Washington, and *Hammon v. Indiana*, a case from the Indiana Supreme Court. *Davis*, 547 U.S. at 817-21. In both cases, the state supreme courts allowed incriminating statements of unavailable victims into evidence over the defendants' objections that admission of such evidence violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id.* at 819, 821. The facts of *Davis*, the Washington case, are similar to the present matter: a victim of domestic violence (Michelle McCottry) called 911 after she was attacked by the defendant (her former boyfriend). *Id.* at 817-18. During the call, McCottry informed the operator of the identity of the defendant and described the attack. *Id.* McCottry did not participate in the subsequent criminal trial and, in her absence, the state submitted a recording of the 911 call. *Id.* at 819. In *Hammon*, the Indiana case, the victim (Amy Hammon) was violently attacked by the defendant (her husband) at their home. *Id.* at 819-20. After receiving a domestic disturbance report, the police arrived on the scene shortly after the incident. *Id.* at 819. Hammon described the violence that the defendant committed to one of the police officers. *Id.* at 819-820. Like McCottry, Hammon also did not participate in the criminal trial that ensued. *Id.* at 820. In light of this fact, the court permitted the officer who spoke to Hammon to recount what she told him during the defendant's trial. *Id.* After setting forth additional clarification regarding what constitutes a testimonial statement, the United States Supreme Court highlighted the factual distinctions between the two cases and concluded that McCottry's statements were nontestimonial in nature, *id.* at 828-29, whereas Hammon's were testimonial in nature. *Id.* at 829-30. That additional clarification is the key to resolving the present matter and is discussed below.

**{12}** The Court in *Davis* recognized the futility of attempting to comprehensively classify what is, and is not, a testimonial statement. *Id.* at 822 (acknowledging the infinite variety of statements a person might make in response to police interrogation). Rather, the Court concluded that the following distinction sufficed:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* Having established this definitional distinction between testimonial and nontestimonial statements, the Court explained that the determination of the admissibility of McCottry's and Hammon's statements was based on whether their statements were given primarily to permit the police to respond to an emergency, or were given for purposes of establishing past acts for purposes of a subsequent criminal prosecution. *Id.* at 826-28. The former category of statements, the Court instructed, is nontestimonial and thus presents no Confrontation Clause problem. *See id.* at 821, 828. The latter category is testimonial and is thus inadmissible pursuant to *Crawford*. *See Davis*, 547 U.S. at 821, 829.

**{13}** In addition to providing a definitional distinction between nontestimonial and testimonial statements, the Court in *Davis* identified four factors to guide courts in their assessment of the category into which a statement falls. *Id.* at 827. The Court observed that a statement is likely nontestimonial if (1) the individual is describing events as they are actually happening rather than describing past events; (2) the individual is facing an ongoing emergency; (3) when viewed objectively, the elicited statements are necessary to resolve a present emergency rather than simply to learn what had happened in the past; and (4) the individual's statements were not made in the safety of a station house or in response to a series of questions with an officer-interrogator taping and making notes but were provided over the phone in an environment that was neither tranquil nor safe. *Id.* In a footnote preceding the Court's discussion of these four factors, the Court stressed that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822 n.1.

**{14}** The Court also observed that, given the nature of 911 calls, a 911 call or transcript of that call may contain both testimonial and nontestimonial statements. "This presents no great problem," the Court explained. *Id.* at 829. "[C]ourts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through in limine procedure, they should redact or exclude the portions of any statement that have become testimonial." *Id.* (emphasis omitted). In other words, and as applied in the present matter, the district court was acting appropriately when it initiated a line-by-line review of the transcript of Gallegos's 911 call. *Davis* specifically charged the district court with this responsibility. The district court erred when it abandoned that task and summarily concluded that the entire transcript was inadmissible.

**{15}** Having laid out the governing law, we turn now to an application of those legal principles to the case before us. To review, *Davis* makes clear that our primary task is to

5

evaluate Gallegos's statements in light of the core definitional distinction between nontestimonial and testimonial statements. The four factors laid out in *Davis* serve as a guide in that determination.

**911 Operator as a Law Enforcement Officer**

**{16}**    Because both parties raise this issue, we briefly discuss whether the 911 operator in this case was acting as a law enforcement officer. Citing the fact that in *Davis* the United States Supreme Court left unresolved "whether and when statements made to someone other than law enforcement personnel are 'testimonial,'" *id.* at 823 n.2, the State argues that statements made to non-law enforcement personnel (such as emergency medical responders) are always nontestimonial. Defendant, on the other hand, contends that under *Davis,* the 911 operator in this case was acting as an agent of law enforcement and the statements are therefore testimonial. We are unpersuaded that this distinction is pertinent in the context of this case. Instead, as in *Davis*, we assume without deciding that the inquiries of the 911 operator amount to "acts of the police." *Id.*

**Analysis of the Facts in the Present Matter in Light of *Davis***

**{17}**    Defendant first argues that Gallegos's statements were testimonial because there was no ongoing emergency in this case. We disagree. A review of the 911 transcript persuades us that Gallegos's statements in that transcript are entirely nontestimonial in nature, as that term is defined in *Davis*. Gallegos initiated the 911 call only moments after she was attacked; she told the 911 operator that Defendant had *just* attacked her. She informed the 911 operator that she had just fled from him and that Defendant had initially pursued her while continuing to brandish the instrument with which he had attacked her. She informed the operator that it appeared Defendant was under the influence of alcohol or drugs. Gallegos was crying throughout the call, which reflects her frightened and panicked state and further demonstrates that Gallegos initiated the call at a moment filled with exigency. She informed the operator that she was, at that very moment, experiencing significant pain and described the violent episode which was the source of that pain. When she fled her house, Gallegos left her two small children behind. Contrary to Defendant's assertion, Gallegos did not tell the operator that Defendant "would not harm the children." Rather, she stated that she was uncertain whether he might harm them. Given the events that had just transpired, Gallegos was clearly expressing concern for the children's safety. She provided the 911 operator the identity of her attacker, a description of him, whether he had a proclivity for violence, whether he was likely to flee the area, and whether he was armed with dangerous weapons. These facts were essential to assist the police in safely apprehending Defendant, an immediate and ongoing concern.

**{18}**    These circumstances manifestly indicate that the United States Supreme Court's conclusion in *Davis* is equally applicable in this matter. "[T]he circumstances of [the 911] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." 547 U.S. at 828. Gallegos "simply was not acting as a *witness*; she

6

was not *testifying*. What she said was not a weaker substitute for live testimony at trial. . . . No witness goes into court to proclaim an emergency and seek help." *Id.* (internal quotation marks and citations omitted). Based on our evaluation of the objective circumstances surrounding Gallegos's phone call, and in light of the four factors set forth in *Davis*, we are persuaded that any reasonable listener would conclude that Gallegos was facing an ongoing emergency and was describing events as they unfolded.

**Gallegos Was Describing Events as They Were Happening**

{19} Applying the first *Davis* factor, we observe that, although Gallegos told the 911 operator of events that had just occurred, those occurrences served to establish whether Defendant posed a present danger. The facts here plainly contradict Defendant's assertion that Gallegos was reporting past events. Gallegos's statements that she was experiencing pain, the cause of that pain, her emotive responses conveying fear, and her uncertainty about the safety of her children are all statements concerning an immediate and existing state of events. Gallegos's description of Defendant, his present whereabouts, his proclivity for violent behavior including whether he had harmed Gallegos in the past, whether he was armed, whether he would flee, what he had been doing in the hours preceding the attack, and her observation that Defendant appeared to be under the influence of drugs and/or alcohol all served to establish not only whether Defendant posed continuing danger to Gallegos, but also to provide the police officers dispatched to apprehend Defendant with the information they needed to ensure their safety while carrying out that task. *See id.* (stating that "[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim" (alterations in original) (internal quotation marks and citation omitted)). *See, e.g.*, *Collins v. State*, 873 N.E.2d 149, 154-55 (Ind. Ct. App. 2007) (discussing *Davis* and observing that information elicited from a 911 caller permitting the swift and safe apprehension of 911 caller's assailant constitutes nontestimonial statements); *State v. Bennett*, 218 S.W.3d 604, 612-13 (Mo. Ct. App. 2007) (same); *Santacruz v. State*, 237 S.W.3d 822, 828-30 (Tex. Ct. App. 2007) (same); *State v. Williams*, 150 P.3d 111, 120 (Wash. Ct. App. 2007) (same).

{20} Defendant seems to argue that under *Davis*, a 911 caller must be describing a criminal offense as it is happening, with the perpetrator present, for the caller's statements to be nontestimonial. We disagree and note first that *Davis* does not so hold; rather it considers this as only one factor to be considered in determining whether statements were made under circumstances objectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency. 547 U.S. at 827. Further, with respect to Gallegos's description of the attack itself, the fact that Gallegos initiated the 911 call after the attack—and was thus describing an event that had already occurred—does not, in and of itself, render those statements a description of past events. In *State v. Camarena*, 176 P.3d 380, 387 (Or. 2008) (en banc), the Supreme Court of Oregon found that a 911 call made moments after a woman was attacked by the defendant (her boyfriend) had sufficient "temporal proximity" to the attack itself to permit the court to

7

conclude that the call described an immediate event rather than a past incident. We are equally persuaded that the temporal proximity between the attack and Gallegos's statements to the 911 operator describing Defendant and how he attacked her—the record reflects that Gallegos made the call as soon as she was able—establishes that she was similarly reporting an occurring event rather than a past incident. To conclude otherwise would ignore, in our view, what is likely a common feature of 911 calls initiated by victims of violence. The call almost universally occurs after the violent incident. Accordingly, the circumstances surrounding the 911 operator's questioning of Gallegos objectively indicates that the primary purpose was to assist police in meeting an ongoing emergency.

**Gallegos Faced an Ongoing Emergency**

**{21}** As to the second *Davis* factor, a review of the 911 call shows that any reasonable listener would recognize that Gallegos was facing an ongoing emergency. She had just fled her home, partially dressed, after having been violently attacked. Defendant pursued her with the instrument with which he attacked her. She was forced to seek refuge in the home of a stranger and was frightened, injured, and in pain.

**{22}** Defendant contends that Gallegos was not facing an ongoing emergency because having successfully fled from Defendant, she was not in imminent risk of further injury. Defendant focuses on Gallegos's statement to the 911 operator that she was in a neighbor's home and did not anticipate any further violence from Defendant. We find Defendant's assertions unpersuasive for three reasons. First, Defendant punched Gallegos in the head and back and swung the pole at her elbow. When she ran out of the house, he was running after her with the pole indicating that he might follow her. Second, as previously noted, both the United States and New Mexico Supreme Courts have stressed that we must examine the statements made during the interrogation from an objective perspective. *Davis*, 547 U.S. at 822; *State v. Ortega*, 2008-NMCA-001, ¶ 29, 143 N.M. 261, 175 P.3d 929 (filed 2007), *cert. denied*, 2007-NMCERT-012, 143 N.M. 213, 175 P.3d 307 ("At the core of the [*Davis*] analysis is the objective purpose of the interrogation."). As such, we find Defendant's emphatic reliance on Gallegos's statements that she subjectively believed she was no longer in danger misplaced. Objectively, Gallegos's statement that she was not at risk of further harm is nothing more than speculation. There is nothing in the record to refute that Gallegos had no objective way of knowing whether Defendant was still a threat to her safety, the safety of her children, the safety of the neighbors who were protecting her, or the safety of other residents in their community.

**{23}** Our third reason for rejecting Defendant's argument that the ongoing emergency had ended concerns the scope of the definition of ongoing emergency. Defendant's assertion that Gallegos's separation from Defendant neutralized the ongoing emergency is premised on a constrained definition of that term. According to Defendant, the ongoing emergency ended when Gallegos's physical proximity to Defendant prevented him from further injuring her. This assertion ignores the facts that Gallegos was injured, needed medical attention, was terrified, and was crying; that a criminal offense had just occurred; and that the perpetrator

of that offense remained at large. As demonstrated by the following authorities, we conclude that Defendant's narrow definition of the term ongoing emergency is erroneous.

**{24}** In *Smith v. United States*, 947 A.2d 1131, 1134 (D.C. 2008), the defendant (the victim's estranged husband) objected to the admission of the victims's 911 call arguing that under *Davis*, his departure from the crime scene after he had attacked the victim indicated that the emergency, and any imminent threat to the victim, had subsided. The District of Columbia Court of Appeals responded that the defendant's assertion was premised on an "unduly restrictive" definition of the term ongoing emergency. *Id.* The Court explained that "to make the actual physical presence of the alleged wrongdoer a dominant factor in determining whether there is an ongoing emergency, narrows and distorts the guiding principle to be applied to a wide range of circumstances." *Id.* In a similar case, but in far more colorful language, the California Court of Appeals in its analysis of the ongoing emergency factor of *Davis* rejected a nearly identical argument. *See People v. Brenn*, 60 Cal. Rptr. 3d 830, 838 (Ct. App. 2007). The defendant in that case asserted that the statements recorded in a 911 call initiated by the victim he had stabbed did not occur during an ongoing emergency because the victim fled the scene of the stabbing and found refuge in a neighbor's home where he called 911. *Id.* The court's response to this argument is as well reasoned as it is piquant:

> [The defendant] questions whether [the victim] was facing an emergency at all, given that [the victim] had gone next door to call the police. This is an argument much easier to make from a law office than from 100 feet from someone who has just stabbed you. At the time of the call, [the victim] was suffering from a fresh stab wound, [the defendant] was still at large, and it was unclear whether [the defendant] still had any weapons or was searching for [the victim]. . . . It is hard to construct a definition of the word 'emergency' that this scenario does not fit.

*Id.*; *accord United States v. Arnold*, 486 F.3d 177, 190 (6th Cir. 2007). In light of these authorities, as well as our review of the circumstances surrounding Gallegos's 911 call, we are persuaded that the call was made during an ongoing emergency.

### The Statements Elicited From Gallegos by the 911 Operator Were Necessary to Resolve a Present Emergency

**{25}** Under the third *Davis* factor, our review of the questions posed to Gallegos by the 911 operator and the statements those questions elicited, when viewed objectively, reveals that the questions were clearly directed at resolving the present emergency and not to learn what had happened in the past. The 911 operator elicited from Gallegos the following information: what had happened to Gallegos, when the attack had happened, who had attacked her, whether Gallegos was under any imminent threat, where her attacker might be located, whether her attacker was intoxicated, whether her attacker was armed, and whether her attacker had a proclivity for violence and posed a threat to the officers dispatched to

apprehend him. These are precisely the types of questions a 911 operator would need answered in order to orchestrate an adequate and safe response to a present emergency. *See People v. Dominguez*, 888 N.E.2d 1205, 1212-13 (Ill. App. Ct. 2008) (discussing the third factor of *Davis* and concluding that the 911 operator's questions—"why [the victim] was fleeing [the] defendant, what [the victim's] injuries were, where [the victim] was located, and where [the victim] left [the] defendant,"—were clearly designed to resolve a present emergency).

{26}     We are not persuaded that the operator's question regarding whether Defendant had harmed Gallegos previously, and her response that he had, is "obviously . . . [a statement regarding] prior bad acts" and constitutes a testimonial statement. To conclude that this question and Gallegos's response were directed at unearthing information about Defendant's prior conduct for purposes of a subsequent criminal prosecution assumes a great deal. Our review of the transcript suggests that this question had a number of possible purposes, most prominently, to calm Gallegos down in a tense and anxiety-filled moment and to ascertain whether Defendant has a penchant for violence and was likely to pose a threat to the responding officers. Furthermore, after asking this question and receiving Gallegos's response that Defendant had acted violently towards her in the past, the operator asked no follow-up questions. Such questions would be anticipated if the operator's initial inquiry was for purposes of criminal prosecution. Accordingly, as we have previously stated, we see no reason to exclude the statements derived from Gallegos during this particular exchange on Confrontation Clause grounds.

**Gallegos's Statements Were Provided Over the Phone in an Environment That Was Neither Tranquil nor Safe**

{27}     Finally, under the fourth *Davis* factor, despite the fact that Gallegos called 911 from a neighbor's house and stated that she did not believe she was under any immediate threat from Defendant, we conclude that the circumstances of Gallegos's call indicate that she was neither safe nor in a tranquil environment during that call. She was in a stranger's home, facing an uncertain but very real threat, she was injured and frightened, and she was anxiously awaiting the arrival of the police and medical assistance. Our conclusion that these circumstances demonstrate that Gallegos was not in a safe or tranquil environment is supported by the court's discussion in *Davis* as to what constitutes a safe and tranquil environment. As used in *Davis*, the phrase "safe" and "tranquil" environment do not refer to the absence of an immediate threat but to an environment akin to formal police interrogation. *See Davis*, 547 U.S. at 827.

{28}     The court reached the conclusion in *Davis* that McCottry was not in a safe or tranquil environment by contrasting her circumstances and the circumstances surrounding the statements given by Hammon with the statements of the declarant in *Crawford*, which the court held were clearly testimonial in nature. The Court observed that "[t]he questioning that generated the [declarant's] statement in *Crawford* . . . was made and recorded while [the declarant] was in police custody, after having been given *Miranda* warnings." *Davis*, 547

10

U.S. at 822 (discussing *Crawford*). Based on this distinction, between McCottry's statements and those in *Crawford*, the Court concluded that McCottry's statements were not provided in an environment that was safe or tranquil:

> [T]he difference in the level of formality between the two interviews is striking. [The declarant in *Crawford*] was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

*Davis*, 547 U.S. at 827.

**{29}** Turning to the Court's discussion in *Davis* of the circumstances surrounding the in-person police questioning of Hammon, the Court observed that Hammon's "interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies." *Id.* at 830. This type of interrogation, according to the Court, had a "striking resemblance" to the *Crawford* interrogation. *Davis*, 547 U.S. at 830. Highlighting the similarities between them, the Court noted that "[b]oth declarants were actively separated from the defendant[s] . . . Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over." *Id.*

**{30}** In this case, unlike the formal police interviews in *Crawford* and with Hammon in *Davis*, Gallegos' conversation with the 911 operator was not calm, formal, or controlled but was more akin to McCottrey's call in *Davis*. Indeed, the tape shows Gallegos was crying and frantically answering the 911 operator's questions in an environment that was neither safe nor tranquil. As with the first three *Davis* factors, we find that the fourth *Davis* factor also supports the conclusion that Gallegos's statements are nontestimonial.

**Limitations on Our Holding**

**{31}** We emphasize that our decision that Gallegos's statements to the 911 operator are admissible is limited to the facts in this case. District courts should conduct an independent analysis of 911 calls applying the four *Davis* factors to the facts before it. We also emphasize that our opinion addresses only the precise issue of whether the statements are admissible under the Confrontation Clause. At trial, it is possible that some other issue regarding the admissibility of those statements could arise.

**CONCLUSION**

**{32}** For the foregoing reasons, we conclude that Gallegos's statements to the 911 operator were not testimonial and therefore do not violate Defendant's Sixth Amendment rights under

11

the Confrontation Clause.  Accordingly, we reverse the district court's ruling and remand for further proceedings in accordance with the foregoing opinion.

{33}    **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**ROBERT E. ROBLES, Judge**

## Appendix

Operator:     911 emergency what is the city please?

Woman:        I ahh, I need a police officer to come to my house.

Operator:     What is your address?

Woman:        Um, 320 Lopez in Chamberino

Operator:     320 Lopez?

Woman:        Yes sir. (Crying)

Operator:     In Chamberino?  Okay, what's going on?

Woman:        My boyfriend just hit me across the arm with a, with a with a pole.

Operator:     What's your name?

Woman:        Celina (crying)

Operator:     What's your phone number Celina?

12

Woman:      I don't have, I don't have a phone, I'm at a neighbor's house.

Operator:   You're at a neighbor's house?

Woman:      Yes (crying)

Operator:   Okay, where is Lopez off of San Luis Avenue on Francisco?

Woman:      I'm not sure, we barely moved over here, I just--

Operator:   Okay

Woman:      I was just, we live in front, in back of the um fire depart, the fire department in Chamberino

Operator:   Okay, I (inaudible) think I got it.

Operator:   Okay, what's your name?

Woman:      Celina

Operator:   Okay, what's his name?

Woman:      Joseph (crying)

Operator:   Do you need an ambulance?

Woman:      I . . . I don't know.  I just know my elbow hurts like, like really really bad.

Operator:   Okay.  We'll get you some help over there.  Okay, ahh, oh Jesus.  Okay, where is he at?

Woman:      He's at the house with my daughters.

Operator:   And you're at a neighbor's house?

Woman:      Yes.

Operator:   Are there any weapons?

Woman:      Uhm, no, I don't think so.

Operator:   Okay.  And his name is Joseph, you said?

13

| | |
|---|---|
| Woman: | Yes. |
| Operator: | How old is he? |
| Woman: | I'm sorry? |
| Operator: | How old is he? |
| Woman: | He's 21. |
| Operator: | Okay, and he's there with the daughter? |
| Woman: | Yeah, he . . . yeah, my two daughters. |
| Operator: | Is anybody else hurt over there? |
| Woman: | No. |
| Operator: | How many kids are there at the house? |
| Woman: | Two |
| Operator: | How old are they? |
| Woman: | Ahh, one's 4 and one's 1. |
| Operator: | Okay, uhm, has he been drinking or anything? |
| Woman: | No |
| Operator: | Uhm, is he on any drugs? |
| Woman: | No, I don't think so. He barely came home last night. |
| Operator: | From where? |
| Woman: | From out with some guys. |
| Operator: | Okay. And you don't know if there's any weapons or anything? |
| Woman: | No. |

Operator: Okay. I want you to calm down, I want you to stay on the phone with me. Would he hurt the girls, do you know? (inaudible)

Woman: I don't think so.

Operator: Okay. Where else are you hurt at?

Woman: Just my elbow, he just swung the pole at my elbow (inaudible). He was punching me a couple of times on my head and my back, that's it.

Operator: Okay. Hold on, stay on the line. (Inaudible) . . . I'm talking to her. Okay. Is he in the living room or where?

Woman: I think so.

Operator: Okay. Um, what is he wearing right now?

Woman: A grey shirt with the blue pants.

Operator: Hang on okay. Don't hang up. Paul? Paul? Ask . . . (inaudible) It's aah 320 South Lopez, so I can make a copy. Hang on okay . . . (inaudible) . . . Did he follow you out there or anything?

Woman: He was, he was running after me with the pole but I ran over here.

Operator: Okay. Try to calm down okay. We are going to get you some help out there. Did it copy to him? No, okay. Okay. Take a deep breath okay.

Woman: Yes.

Operator: Okay, they're on their way over there. Okay, what would he be driving if he decided to leave?

Woman: Uhm, he doesn't have a car. He would just walk.

Operator: No, negative on all that, negative on all of that now.

Woman: (crying) ouh

15

Operator:     What neighbor's house are you at?

Woman:        I'm sorry

Operator:     What neighbor's house are you at? Is it across the street or?

Woman:        No, it's across the way (inaudible), next to the church. (crying)

Operator:     What color, what, do you know the address there?

Woman:        What's your address? 702 Convent.

Operator:     Convent?

Woman:        Yes Ma'am.

Operator:     Okay, let me know if anything changes[.] What's going on with your arm, is it swelling, is it uh?

Woman:        I'm not sure, I can't even move it, it hurts, like really bad.

Operator:     We're getting help over there okay?

Woman:        Okay

Operator:     Are you in a trailer or is it that house?

Woman:        No, it's a house.

Operator:     Okay, what kind of pole did he hit you with?

Woman:        Um, it's, it's a gold metal rod kind of pole for, I'm not sure for what it's for.

Operator:     And you don't know, and you don't know what it is used for?

Woman:        No, it's a, it's very thick, I don't know. (crying)

Operator:     Ma'am, I am getting you help okay?

Woman:        Okay

Operator:     What, so you don't know your neighbor's phone number?

16

| | |
|---|---|
| Woman: | Uh, no they have a cell phone, its [sic] one of their boyfriend's cell phone. |
| Operator: | Okay, can I have, ask them if I can have that number just in case we, I lose you, I can call you right back. |
| Woman: | The police said if he can have the number so that if anything happens he can call back. [Telephone number provided by the woman omitted.[1]] |
| Operator: | Okay, try to (inaudible) they are on their way okay. Is he still in the house? |
| Woman: | I'm not sure. |
| Operator: | And the girls, where are they at? Are they still in the house? |
| Woman: | Their [sic] inside, their [sic] inside the house. |
| Operator: | Can he see you from where you are at? |
| Woman: | Yeah, he can see? |
| Operator: | Okay, and he wouldn't go over there to the neighbor's house. |
| Woman: | Nah, he wouldn't come over here. |
| Operator: | What are you wearing? |
| Woman: | (Inaudible) with baby blue on them with just a tank top, like a sports bra. |
| Operator: | Has he done this to you before? |
| Woman: | Ah, yeah, we've, I've called the cops before and oh. |
| Operator: | Okay, (inaudible) they are on their way. |
| Woman: | (moaning) |

---

[1] The district court concluded that the telephone number Gallegos provided to the operator should be omitted from the record for purposes of privacy. As a matter of prudence, we adopt that conclusion.

Operator: And, they said, you said he came home last night from being with his friends. Can you tell if he was drinking or anything?

Woman: Uh no, I don't know. It looked like he was, he was on something though.

Operator: But there's no guns or anything in the house?

Woman: No, not that I seen

Operator: He doesn't carry a knife with him or anything?

Woman: No (crying)

Operator: How is your arm doing?

Woman: It like really hurts really bad.

Operator: (Inaudible)

Woman: My elbow.

Operator: (Inaudible)

Woman: Huh.

Operator: Is it swelling up?

Woman: I'm, I'm not sure, I can't see cause it's on it's on my elbow.

Operator: On your elbow. Can you hear them coming towards you?

Woman: Um yeah, I can hear somebody.

Operator: Okay

Woman: But like really far.

Operator: I think they're by the church. More close by. What color's their house?

Woman: I'm sorry

Operator: What color is their house?

18

| Woman: | My house is brown.  Okay, I see a police going towards my house. |
|---|---|
| Operator: | Okay, I'm gonna go ahead and let you go so you can go speak with them okay? |
| Woman: | Okay |
| Operator: | All right, bye bye. |
| Woman: | Bye |

**Topic Index for *State v. Soliz*, No. 28,018**

| **AE** | **APPEAL AND ERROR** |
|---|---|
| AE-SR | Standard of Review |
| AE-IA | Interlocutory Appeal |

| **CT** | **CONSTITUTIONAL LAW** |
|---|---|
| CT-CT | Confrontation |

| **CL** | **CRIMINAL LAW** |
|---|---|
| CL-DO | Domestic Violence |

| **CA** | **CRIMINAL PROCEDURE** |
|---|---|
| CA-WT | Witnesses |